## Richmond

WILLARD SHORES, ET AL. v. ADA H. SHAFFER, ET AL.

January 17, 1966.

Record No. 6095.

Present, All the Justices.

*Willis A. Woods* and *Paul S. Hudgins* (*Woods & Gleaves; Hudgins & Coulling*, on brief), for the appellants.

*E. G. Shaffer*, for the appellees.

BUCHANAN, J., delivered the opinion of the court.

■ We have for decision competing claims to the sand and gravel on a tract of land on Sand Mountain, a spur of Lick Mountain, in Wythe county.

Willard Shores and Virginia Ruth Shores, his wife, herein referred to as plaintiffs, together with Carroll Rock Company, Inc., filed in the circuit court a motion for a declaratory judgment against Ada H. Shaffer and others, herein called defendants, asking the court to adjudicate that they "have the full and complete ownership of the rock, sand, gravel and related materials" on the land in question.

The court without a jury heard the evidence and held that the plaintiffs are the owners of the "surface rights" to said property, and the rights incident thereto, including support for the surface; and that the defendants are the owners of the "sub-surface rights" in the said property and of the minerals therein; but have no right to damage the surface and the surface is entitled to support; that portions of the material being removed are mineral, and the minerals on the surface are owned by the defendants "subject to the surface rights, use of the same and support of the surface" of plaintiffs.

From the order recording these conclusions we granted plaintiffs an appeal.

Plaintiffs' title came by a deed from Wythe C. Smelser dated July 31, 1952, conveying to them for a consideration of $815 "the surface right in all of that certain tract or parcel of land" described by metes and bounds, containing 23.76 acres, after deducting 3.33 acres previously conveyed by Smelser, and stated to be the same property conveyed to Smelser by Parsons and Walker, Special Commissioners, and being part of a tract of 88 acres conveyed to Sallie A. Jonas by A. A Campbell, Commissioner, by deed dated March 10, 1902. The deed from Campbell, Commissioner, to Sallie A. Jonas conveyed to her the "surface right" in the 88-acre tract.

Defendants claim title under a deed dated April 9, 1923, from Stuart B. Campbell, Special Commissioner, to J. C. Shaffer, J. J. Wohlford and E. Lee Trinkle, which conveyed to the grantees, for a consideration of $25, "whatever mineral interest the estate of W. A. Stuart owns" in seven tracts of land, described by reference to other deeds, four of which tracts were stated to contain an aggregate of 319 acres and the acreage of three was not given. The fourth tract listed is stated to be a tract of 88 acres conveyed to

Sallie A. Jonas by deed of March 10, 1902, under which the plaintiffs also claim.

The defendants are the successors in title of the grantees in the deed of April 9, 1923, from Stuart B. Campbell, Commissioner. They own "whatever mineral interest" the estate of W. A. Stuart owned in said tract on April 9, 1923. There is nothing in the deed or in the record to show what that mineral interest was.

By contract dated February 9, 1963, plaintiffs granted to Carroll Rock Company the exclusive right to take rock, sand and gravel from said tract, excepting about five acres around a dwelling thereon, with the right to remove overburden, and other operating rights, for which it agreed to pay twenty-five cents per truck load. The contract was for five years with right of renewal for ten additional years.

On May 2, 1963, E. G. Shaffer, attorney, wrote to Carroll Rock and Shores that removal of sand and other material from said tract was in violation of the rights of the defendants and requested that there be no further removal. Carroll Rock in the meantime had contracted, or was contracting, with Oman Construction Company to furnish large quantities of sand and gravel for constructing a section of the interstate highway around Wytheville; which Carroll Rock expected to get from the Shores tract. Failure to get the Shores material threatened very heavy loss to Carroll Rock and upon receipt of Shaffer's letter the president of the company sought legal advice. His attorney advised him to see Shaffer and work out the best deal he could.

As a result the defendants entered into a written agreement with Carroll Rock dated May 13, 1963, leasing to Carroll Rock "all of the sub-surface rights" in the Shores tract conveyed to the defendants' predecessors by the deed of April 9, 1923, for which Carroll Rock agreed to pay to the defendants four cents a ton, or eight cents per cubic yard, at Carroll Rock's option, for all material used as base material for highway construction, and fifteen cents per ton for all material used as sand for blending with asphalt.

Carroll Rock seeks now to annul this contract on the ground that defendants do not own the sand and gravel and the contract was based on a mutual mistake of fact.

As noted, defendants own only whatever mineral right the estate of W. A. Stuart owned. Their evidence was directed to establishing that sand is a mineral and therefore they own the sand. It was as follows:

Charles R. Huddle testified that he owned an interest in what is known as the "Big Survey" in the area of the Shores tract, containing some 9,000 acres in fee and 4,000 in minerals, and that the commercial minerals known by him to exist on Sand Mountain were iron, managanese and quartzite, and that he had always classed quartzite as a mineral and had shipped it from nearby property for use in the manufacture of ferro silicon and silicon.

His son, an engineer, gave the opinion that "purity" would go a long way to determine whether quartzite and silicon were minerals, and that he would say that the material in the sub-surface of the Shores property was above 98 percent quartz. During the war emergency some managanese and some quartzite were shipped from this property but none since 1944. Since that time and up to 1960, a considerable tonnage of managanese ore was taken from this area.

In 1888 a geologist made a map of Wythe county and indicated thereon the presence of iron, managanese, quartz and sand in this area.

C. B. McGavock, Jr., who had worked as a government geologist in this general area, testified that he examined the Carroll workings and that the material being taken "is a quartzitic material which is known geologically as the Erwin quartzite;" that it is a sandstone quartzite "quite characteristic of the Erwin formation and is in abundant occurrence on Lick Mountain wherever Erwin quartzite outcrops." He explained that quartzite is a rock name "composed primarily of the mineral quartz;" that quartz is a mineral and if rock is 99 percent quartz it has to be the mineral quartz. He said sandstone and quartzite are interchangeable words, and that the soil of the Shores property is predominantly sand.

He further testified that all rocks are made up of minerals in some proportion; that the designation of sand is more textural than mineralogical; that 90 percent of topsoil is mineral and "[a]nything on the surface of the earth is minerals."

Samples from the Erwin quartzite formation taken from the Shores property were subjected to x-ray analyses by Dr. Mitchell of the University of Virginia Department of Geology, who reported that they were "composed essentially of the mineral quartz."

It is not doubtful from the evidence that the sand being taken by Carroll Rock from the Shores property is geologically and technically a mineral. But that does not answer the question of whether the defendants acquired ownership thereof under the 1923 deed conveying to their predecessors whatever mineral interest was then owned by the W. A. Stuart estate.

The sand and gravel on the Shores tract are an integral part of the surface. The sand comes to the top of the ground. In some places the topsoil is very thin and at other places it extends down two or three feet, where the root structure of the growing vegetation has extended to that depth. Carroll Rock's president testified that the topsoil was actually sand and all they did in removing the sand was to take the brush off the surface and the rest is usable for road material.

He further testified without contradiction that there was no other way possible to remove the sand except by going in from the surface; that any sort of deep mining would cause the top to collapse because it is all sand; that they have excavated to about fifty feet at the deepest point and the sand there is about as it is on the top of the surface. They remove the sand by loading it with a shovel into trucks. Photographs were exhibited showing the face of the loading pit extending above the arm of the mechanical shovel.

No right of removal of any kind was granted to defendants' predecessors. It was common knowledge, and known of course to the grantees in the deed of April 9, 1923, two of whom were distinguished lawyers, that the property herein involved was sand in a mountain of sand. Surely if they thought this sand was included in the mineral interest conveyed to them they would have been concerned about some right to take it without destroying the surface rights that had been conveyed to the plaintiffs' predecessors many years before.

The sand under the surface could not be removed without taking the surface. In 1923 the surface had been conveyed away. It would seem to be plain that the deed of 1923 conveying an undescribed mineral interest in seven tracts of land for a consideration of $25 was not intended to convey sand, which was visible on every hand and the main component of the soil, without making any reference to sand or providing any way for separating it from the adversely held surface.

*Beury* v. *Shelton*, 151 Va. 28, 144 S.E. 629, involved a similar situation. Beury conveyed to Shelton two tracts of land, excepting and reserving "all the metals and minerals of every kind and character" in and underlying the tracts, with right to excavate any and all such metals and minerals. The reservation was held not to include limestone, although limestone was technically a mineral. There is no doubt, the opinion stated, that limestone is a mineral in the scientific or geological sense, which classifies all matter as animal, vegetable or mineral, but that it is rare, if ever, that mineral

is intended in this sense in the ordinary trading transactions about which deeds and contracts are made; that what the courts attempt to do is to ascertain what the parties intended by the language employed; that in the area of the property involved limestone was a part of the soil, and a conveyance that reserved limestone with the right to remove it reserved practically everything and granted nothing.

The opinion cited *White* v. *Sayers,* 101 Va. 821, 45 S.E. 747, holding that coal was not included in the term "minerals" as used in the instrument there construed; and cases from other jurisdictions were cited to the effect that the best construction is made by viewing the subject of the contract as the mass of mankind would view it; that the owner of land who grants the minerals does not use the term as synonymous with mineral substances, because if it was given that meaning, " 'it would amount to a grant of the whole land,· as the soil and all below it would be embraced in that description.' "

It is generally held that sand and gravel are not ordinarily included in the term "minerals" in deeds and contracts, and title thereto does not pass unless a purpose to include them is clearly shown by the instrument. *Witherspoon* v. *Campbell,* 219 Miss. 640, 69 So. 2d 384; *Psencik* v. *Wessels,* Tex. Civ. App., 205 S.W. 2d 658; *Beck* v. *Harvey,* 196 Okl. 270, 164 P. 2d 399. See also 58 C.J.S., Mines and Minerals, § 155 at p. 324; Anno., 86 A.L.R. at 989.

In *Waring* v. *Foden,* Eng. Ct. App., (1932) 1 Ch. 276, 86 A.L.R. 969, a reservation of "all mines, minerals and mineral substances" with right to remove same by underground workings only, did not include sand or gravel. It was said that it would be "a negation of the substance of the transaction to hold that all sand and gravel, which is very generally a part of the soil and subsoil of this farm and worked and gotten from the surface, was excepted from the grant and remained the property of the plaintiff."

We hold that the sand and gravel on the Shores tract were not included in the deed of April 9, 1923, and were not thereby conveyed to the predecessors of the defendants, and therefore the defendants have no right therein or title thereto; but that the sand and gravel on said tract passed to and became the property of the plaintiffs by virtue of the deed to them of July 31, 1952, from Wythe C. Smelser. *Cf. Ramage* v. *So. Penn Oil Co.,* 94 W. Va. 81, 118 S.E. 162.

■ The motion for declaratory judgment in this case alleged that while Carroll Rock Company denied that it was indebted in any amount to the defendants under the contract of May 13, 1963, it had paid in escrow to a Wythe county bank $2,016.88, representing

the amount payable under the terms of said contract, in addition to the amount paid Shores, for the material taken from the Shores property as of January 10, 1964; and that under the escrow arrangement with said bank, the said payment plus any additional payments for material is to be held by the bank in escrow until the adjudication of the matters presented by the motion.

In their answer the defendants "aver that the escrow account should be held by the Circuit Court for Wythe County, and will move the Court for an accounting by Carroll Rock Company on the 30th day of each month for accounts due under said contract and payment thereof to the Clerk of said Court, until further order of Court."

By the said contract of May 13, 1963, defendants leased to Carroll Rock Company, as noted above, "all of the sub-surface rights" in the Shores property. The defendants did not own the sand and gravel on the Shores land or any right in connection therewith, and consequently they leased nothing to Carroll Rock Company and that company has taken nothing that belonged to the defendants. While there was no specific escrow agreement between the defendants and Carroll Rock, the fact is that the latter put the money payable under the contract of May 13, 1963, in the bank instead of paying it directly to the defendants, and there is nothing in the record to indicate that the defendants objected to that being done, but indicated by their answer an understanding on their part that they were not entitled to the money unless and until it was settled in the litigation that they in fact owned the sand and gravel.

We hold, therefore, that the defendants are not entitled to the money so placed in escrow, in agreement with the principle stated in *Robertson* v. *Robertson*, 137 Va. 378, 119 S.E. 140, that "'Assumpsit will lie whenever the defendant has received money which is the property of the plaintiff, and which the defendant is obliged by natural justice and equity to refund,'" quoting from *Bayne* v. *United States*, 93 U.S. 642, 23 L. ed. 997.

The order of the trial court appealed from is reversed.

Since the bank which holds the money in escrow is not before the court, and the total of the payments made by Carroll Rock Company to the bank and what charges, if any, are against the same, are not shown, the case is remanded to the trial court with direction to enter an order requiring that the money in escrow, less any proper charges against the same, be returned to Carroll Rock Company.

*Reversed and remanded.*