The STATE OF QATAR, et al., Plaintiffs,

v.

**FIRST AMERICAN BANK OF VIRGINIA,** d/b/a First Union National Bank of Virginia, et al., Defendants.

**FIRST UNION NATIONAL BANK OF WASHINGTON, D.C.,** successor in interest to First American Bank, N.A., Third–Party Plaintiff

v.

**CENTRAL FIDELITY BANKS, INC.,** Third–Party Defendant.

Civ. A. No. 94–1081–A.

United States District Court, E.D. Virginia, Alexandria Division.

April 4, 1995.

Dorothy B. Fountain, Richard L. Cys, Davis, Wright, Fremaine, Washington, DC, for plaintiffs.

Daniel S. Fiore, Arlington, VA, Grady C. Frank, Jr., Hazel & Thomas, P.C., Alexandria, VA, for First Union Nat. Bank of Virginia.

Robert K. Richardson, Odin, Feldman & Pittleman, P.C., Fairfax, VA, for Central Fidelity Banks, Inc.

## MEMORANDUM OPINION

ELLIS, District Judge.

At issue in this diversity jurisdiction case is whether, and under what conditions, a drawer may sue a depositary bank for conversion under pre–1993 Virginia commercial law. Specifically, the question presented is whether a drawer may sue a depositary bank for conversion where (1) the drawer's employee has induced the drawer to write checks to fictitious payees, (2) the employee then fraudulently endorsed the checks and deposited them into his personal account with the depositary bank, and finally, (3) that bank cashed the checks in some instances in violation of restrictive indorsements and general standards of commercial reasonableness.

### I.

Plaintiffs are the State of Qatar, the Ministry of Education of the State of Qatar, and the Embassy of the State of Qatar (collectively, "Qatar"). From 1986 through 1992, the Office of Cultural Attache ("OCA") of Qatar's Ministry of Education maintained a checking account at First American Bank of

D.C. ("drawee bank").[1] During this period, an OCA employee named Bassam Salous engaged in a devious and protracted scheme to defraud his employer out of more than a million dollars. Specifically, in his position as chief accountant, Salous created false or duplicate invoices in the name of existing and fictitious creditors of Qatar and proceeded to have checks drawn on the OCA's account in purported payment of these invoices. Salous then deposited the checks into his own personal accounts at various local banks, including Central Fidelity Banks, Inc. and First American Bank of Virginia[2] (collectively, "the depositary banks").

Salous presented the checks for deposit in varying forms. In most instances, he indorsed the checks by forging the fake payee's signature. In doing so, he would sometimes simply indorse the checks in blank. On other occasions, he would add a stamped "FOR DEPOSIT ONLY" restriction after the forged signature, or include a "FOR DEPOSIT ONLY" restriction plus his personal account number following the forged indorsement. At other times, Salous simply deposited the checks without indorsing them at all. For example, Salous would create a fake invoice from "Jane Smith" to Qatar. He would then prepare a check, written on Qatar's account, made payable to "Jane Smith". Salous would thereafter deposit the check into his personal account in one of four ways:

(1) with no signature at all; (2) with a forged "Jane Smith" signature only; (3) with a forged "Jane Smith" signature followed by a stamped "FOR DEPOSIT ONLY" restriction; (4) with a forged "Jane Smith" signature, followed by a "FOR DEPOSIT ONLY" stamp, followed by Salous' handwritten personal account number. Apparently too trusting of their frequent customer, the depositary banks routinely accepted all four categories of checks for deposit, and the drawee bank debited Qatar's account accordingly. Salous even succeeded in depositing checks made payable to corporations into his personal accounts at the depositary banks. Remarkably, this pattern of fraud went undetected for several years.

█ In 1992, officials of Qatar discovered Salous' fraud. Soon thereafter, Qatar brought suit against the depositary banks[3] for conversion and, alternatively, for money had and received.[4] In response, the depositary banks filed this joint motion for summary judgment. They base the motion in part on the general ground that a drawer, such as Qatar, cannot sue a depositary bank directly for conversion, but must instead pursue its action against the drawee bank. In any event, they argue, § 3–405 of the Uniform Commercial Code ("U.C.C." or "Code"), as it existed prior to the January 1, 1993 amendments,[5] governs the so-called "ficti-

1. First American of D.C. is now owned by and doing business as First Union National Bank of D.C.

2. First American Bank of Virginia is now owned by and doing business as First Union National Bank of Virginia.

3. Qatar also included the drawee bank as a defendant under a U.C.C. strict liability theory, Va.Code § 8.4–401(1), but summary judgment has since been granted in the drawee bank's favor under Va.Code § 8.3–405(1)(c), *amended by* Va.Code § 8.3A–405 (Supp.1994).

4. Conversion has been defined as "any wrongful exercise or assumption of authority, personally or by procurement, over another's goods, depriving him of their possession." 19 MICHIE'S JURISPRUDENCE OF VIRGINIA & WEST VIRGINIA *Trover & Conversion* § 4 (1991) (citing *Buckeye Nat'l Bank v. Huff & Cook*, 114 Va. 1, 75 S.E. 769 (1912); *A & E Supply Co. v. Nationwide Mut. Fire Ins. Co.*, 612 F.Supp. 760 (W.D.Va.1985); *Acorn Structures, Inc. v. Swantz*, 657 F.Supp. 70

(W.D.Va.1987)). An action of assumpsit for money had and received "will lie whenever one has the money of another which he has no right to retain, but which ex aequo et bono he should pay over to that other." 2A MICHIE'S JURISPRUDENCE OF VIRGINIA & WEST VIRGINIA *Assumpsit* § 17 (1993) (citing *Robertson v. Robertson*, 137 Va. 378, 119 S.E. 140 (1923); *Shores v. Shaffer*, 206 Va. 775, 146 S.E.2d 190 (1966)). The two torts are quite similar. Because whatever difference exists does not affect the disposition of this action, the Court will refer to the action as one simply for conversion.

5. Va.Code § 8.3–405, *amended by* Va.Code § 8.3A–405 (Supp.1994). Like most states, Virginia has adopted the U.C.C. Because all of the alleged conduct occurred prior to the January 1, 1993 effective date of the amendments to the U.C.C. Negotiable Instruments provisions, the pre–1993 version applies to this case. Therefore, all U.C.C. citations are to Va.Code, Title 8.3, as it existed prior to the January 1, 1993 amendments.

tious payee" or "padded payroll" case and dictates that liability for the fraudulent check-cashing scheme in these circumstances falls solely upon the employer, Qatar. Qatar opposes this motion, contending that there is no general bar to a drawer suing a depositary bank for conversion. Furthermore, Qatar argues, while § 3–405 admittedly renders the forged signature "effective" for further negotiation of the check in these circumstances, the provision does not strip the depositary banks of their independent obligation to respect restrictive indorsements and to act in a commercially reasonable manner. Because the depositary banks repeatedly ignored both obligations in continuing to accept the disputed checks for deposit, Qatar urges, liability appropriately rests on their shoulders. Resolution of this dispute is the task at hand.

## II.

 Analysis appropriately begins with the question whether a drawer may ever sue a depositary bank for conversion.[6] There is no Virginia decisional law on this subject, but the applicable U.C.C. provisions and case law from other jurisdictions provide guidance. In general, when a depositary bank accepts a check with a forged indorsement, and the drawee bank subsequently pays the depositary bank on the check, the drawer has no action in conversion against the depositary bank. *Stone & Webster Eng'g Corp. v. First Nat'l Bank & Trust Co.*, 345 Mass. 1, 184 N.E.2d 358 (1962). This is because a forged indorsement generally is "wholly inoperative" to transfer title to the check. *See* §§ 3–404, 3–202. *See also Stone & Webster*, 184 N.E.2d at 361; *Witten Prods. v. Republic Bank & Trust Co.*, 102 N.C.App. 88, 401

S.E.2d 388, 390 (1991); *Kraftsman Container Corp. v. United Counties Trust Co.*, 169 N.J.Super. 488, 404 A.2d 1288, 1291 (Law Div.1979). Thus, without an effective indorsement, the drawee bank, with whom the drawer has contracted, is not entitled to withdraw funds from the drawer's account in satisfaction of the check. *See* § 8.4–401. *See also Prudential–Bache Sec., Inc. v. Citibank*, 73 N.Y.2d 263, 539 N.Y.S.2d 699, 702, 536 N.E.2d 1118, 1121 (1989). As a result, any money the drawee bank transfers to the depositary bank in payment on the forged check is deemed to come from the drawee bank's own funds, and not from the drawer's account. *Underpinning & Found. Constructors v. Chase Manhattan Bank*, 46 N.Y.2d 459, 414 N.Y.S.2d 298, 300–01, 386 N.E.2d 1319, 1321–22 (1979); *Winkie, Inc. v. Heritage Bank of Whitefish Bay*, 99 Wis.2d 616, 299 N.W.2d 829, 833 (1981) (citing *Grubnau v. Centennial Nat'l Bank*, 279 Pa. 501, 124 A. 142, 143 (1924). Accordingly, the depositary bank never comes into possession of the drawer's funds, and no conversion action by the drawer could lie against the depositary bank.[7] *Underpinning*, 414 N.Y.S.2d at 300–01, 386 N.E.2d at 1321–22. Conversion of the drawer's funds occurs only when the drawee bank thereafter debits the drawer's account, thereby claiming ownership of the drawer's funds in the amount of the forged check. *Id.* The drawer then would have an action under § 8.4–401(1) against the drawee bank for wrongfully charging its account, and the drawee bank in turn may have an action against the depositary bank for breach of the warranty of transfer. § 3–417. *See also Stone & Webster*, 184 N.E.2d at 362–63.[8]

 This analysis describes the case of the typical forged indorsement, where, for

---

6. For purposes of this discussion, it is assumed that the depositary bank is not also the drawee bank.

7. Of course, the proper payee may have a conversion action against the depositary bank, since the check itself is valuable property of the payee. *See* Va.Code § 3–419(3), *amended by* Va.Code § 3A–420 (Supp.1994).

8. There is a line of cases holding that in order to avoid this circuity of litigation, the drawer may simply sue the depositary bank directly for conversion. *See, e.g., Commercial Credit Corp. v.*

*Citizens Nat'l Bank*, 150 W.Va. 196, 144 S.E.2d 784, 789 (1965); *Allied Concord Fin. Corp. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 275 Cal. App.2d 1, 80 Cal.Rptr. 622, 624 (1969). However convenient the result, these cases are unpersuasive. They ignore the fundamental obstacle that because the drawee bank cannot use the drawer's funds to pay a fraudulently indorsed check, the money transferred to the depositary bank comes not from the drawer, but from the drawee bank's own funds. *Underpinning*, 414 N.Y.S.2d at 300, 386 N.E.2d at 1321.

example, the forger steals a check made payable to one of the drawer's legitimate creditors from the drawer's desk. In that case, as noted, the forged indorsement does not operate as a valid negotiation of the check, and the drawee bank may not withdraw the drawer's funds in payment of the check. But the Code provision then in effect altered this result in the "fictitious payee" or "padded payroll" case, where the drawer's employee causes the drawer to write a check to a payee who either does not exist or is simply not entitled to payment by the drawer. § 3–405(1)(c).[9] In this situation, the Code dictates that the indorsement, though forged, is "effective". That is, despite its lack of authenticity, the forged signature is a valid instruction to the drawee bank to pay the check out of the drawer's funds. As a result, when the drawee bank pays the depositary bank on the check, the depositary bank is actually receiving money from the drawer's account. Of course, the depositary bank's possession of the funds does not then constitute a conversion, because the forged indorsement remains effective, and the depositary bank's payment of the check is authorized. Thus, in this event, the drawer bears the loss of its employee's thievery, a result plainly intended by the drafters of § 3–405(1)(c).[10]

█ At this point in the analysis, it is clear that Qatar cannot sue the depositary banks for conversion on the first category of checks, that is, those that bear no indorsement at all. Because there is no indorsement, these checks do not fall under § 3–405,[11] and the checks in this form did not

provide a valid instruction to the drawee bank to withdraw funds from Qatar's account. Thus, similar to the typical forged indorsement case first discussed, the depositary banks received the drawee bank's own funds, not Qatar's, in payment of these checks. Therefore, the depositary banks did not convert any of Qatar's money when dealing with these checks.

█ It is also clear that no conversion occurred with respect to the second category of checks, namely those that bear a forged indorsement and no accompanying restriction. In creating the false and duplicate invoices and preparing Qatari checks in purported payment thereof, Salous plainly "supplied ... the name of the payee intending the latter to have no such interest." § 3–405(1)(c). Thus, § 3–405 dictates that the indorsements, while forged, were effective for negotiation. Accordingly, the drawee bank was authorized to transfer money from Qatar's account to the depositary banks in payment of these checks, and the depositary banks were fully entitled to accept that money. Given the Code's treatment of the forged signature in these circumstances, none of the banks was ever in wrongful possession of Qatar's funds by honoring these checks. Thus, no conversion occurred, and Qatar must bear the loss of its employee's thievery.

█ A somewhat different situation arises with respect to the checks that bear restrictive indorsements. The U.C.C. places upon depositary banks an affirmative obligation to handle checks in a manner that is consistent with any restriction attached

---

**9.** Section 3–405(1)(c), then in effect, provided that: "An indorsement by any person in the name of a named payee is effective if ... an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest." Va.Code § 8.3–405(1)(c), *amended by* Va.Code § 8.3A–405 (Supp.1994). The current version of this provision, though substantially changed, also renders the indorsement effective in this situation.

**10.** The "Official Comment" following former § 3–405 evidences this intent:

The principal followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent

holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee.

Va.Code § 8.3–405 comment 4, *amended by* Va. Code § 8.3A–405 (Supp.1994).

**11.** Section 3–405 plainly requires an "indorsement ... in the name of the named payee." *See Consolidated Pub. Water Supply v. Farmers Bank,* 686 S.W.2d 844, 850 & n. 2 (Mo.Ct.App.1985); *Kraftsman,* 404 A.2d at 1292.

thereto, such as "for deposit only." *See* § 3–206(3).[12] *See also Underpinning,* 414 N.Y.S.2d at 301, 386 N.E.2d at 1322; *Lehigh Presbytery v. Merchants Bancorp,* 410 Pa.Super. 557, 600 A.2d 593, 560 (1991); *Rutherford v. Darwin,* 95 N.M. 340, 622 P.2d 245 (Ct.App.1980). The drawee bank (unless it is also the depositary bank) is under no such obligation. *See* §§ 3–206(2), 3–419(4). *See also Underpinning,* 414 N.Y.S.2d at 301, 386 N.E.2d at 1322; *Spielman v. Manufacturers Hanover Trust Co.,* 60 N.Y.2d 221, 469 N.Y.S.2d 69, 70, 456 N.E.2d 1192, 1193 (1983). Therefore, in honoring the checks with a forged indorsement and a stamped "FOR DEPOSIT ONLY" restriction, the drawee bank in this case acted entirely within its authority. Section 3–405 permitted the drawee bank to treat the forged indorsement as a legitimate one, and §§ 3–206(2) and 3–419(4) relieved the drawee bank of any liability for failure to comply with the restriction. *Underpinning,* 414 N.Y.S.2d at 301, 386 N.E.2d at 1322; *Spielman,* 469 N.Y.S.2d at 70, 456 N.E.2d at 1193.

■ Yet, the depositary banks were not similarly entitled to accept payment on the checks. For, while the forged signature presented no barrier to payment given the effect of § 3–405, the accompanying restriction ("FOR DEPOSIT ONLY") provided a clear instruction to the depositary banks to deposit the funds only into the account of the last indorser—here, the named payee. This they failed to do. Although none of the checks was made payable to Bassam Salous, all of them were deposited into his personal account. By honoring the checks in a fashion that violated the restriction, the depositary

banks were not entitled to accept and retain Qatar's funds. As a result of this wrongful possession, Qatar may sue the depositary banks for conversion on these checks.[13]

■ One final category of checks requires discussion. The disputed checks in this category bear a forged signature, followed by a stamped "FOR DEPOSIT ONLY" restriction, followed thereafter by Salous' handwritten account number. If Salous presented the checks to the depositary banks in this form, then the depositary banks fully complied with the restrictive indorsement, and no action for conversion may lie with respect to these checks. As Qatar's own expert concedes, a check in this form would instruct the depositary bank to deposit the funds only into the referenced account, in this case, that of Bassam Salous. Nonetheless, a factual dispute exists regarding whether Salous' account number following the "FOR DEPOSIT ONLY" restriction was added only after he presented the checks for deposit.[14] This dispute is significant because if the account number was added at the behest of the depositary banks, then the original restrictive indorsement ("FOR DEPOSIT ONLY" into the payee's account) would have been violated. If not,—that is, if Salous had written the account number on the checks prior to handing them to the teller for deposit—then the depositary banks complied with the restriction and would not be liable for conversion. Resolution of this factual dispute must await trial.

### III.

Both parties dispute to some extent the result here reached. For its part, Qatar urges that not only were the depositary

---

**12.** Former § 3–206(3) read:

Except for an intermediary bank, any transferee under an indorsement which is conditional or includes the words "for collection" "for deposit," "pay any bank," or like terms … must pay or apply any value given by him for or on the security of the instrument consistently with the indorsement and to the extent that he does so he becomes a holder for value. Va.Code § 8.3–206(3), *amended by* Va.Code § 8.3A–206.

**13.** This is not to say that the depositary banks are liable as a matter of law on these checks. They may have defenses. *See Underpinning,* 414 N.Y.S.2d at 301–02, 386 N.E.2d at 1322–23.

**14.** Qatar has presented evidence that on many checks, the handwritten indorsement and the handwritten account number were written in different color ink. In addition, there is evidence that handwritten initials or a second signature follow many of the account numbers. This evidence suggests the possibility that the account numbers did not appear following the "FOR DEPOSIT ONLY" restriction when Salous first presented the checks for deposit, but were subsequently added by the bank or at the bank's request.

banks bound to respect the restrictive indorsements, but they were also obligated to comport with general standards of commercial reasonableness in handling the checks. In depositing checks made payable to corporations into Salous' personal account, Qatar argues, the depositary banks behaved in a commercially unreasonable manner, thereby subjecting these banks to liability even on checks with no restriction attached to the indorsement. In support of its argument, Qatar cites § 3–419(3), which provides that a depositary bank is not liable for conversion to the "true owner" of the check provided the bank acted "in accordance with the reasonable commercial standards applicable to [its] business." [15] Because all of the checks were made payable to payees that were intended to have no interest in the checks, Qatar contends that it was the "true owner" of the disputed checks.

Qatar misinterprets the meaning of § 3–419(3). By negative inference, this provision permits the "true owner" of a check, who is the named payee or her assignee, to sue a depositary bank for conversion when that bank's commercially unreasonable behavior allows an imposter to cash the check. This is a sensible result, for the check and its proceeds are valuable property of the payee or a subsequent holder in due course. Although the named payee in a § 3–405 situation, by definition, has no interest in the check and is therefore not the "true owner," the drawer does not then simply step into her shoes under § 3–419(3). To hold otherwise would be to diminish the impact and purpose of § 3–405. By its terms, § 3–405 renders the forged indorsement effective, re-gardless of the bank's negligence or culpability. In effect, § 3–405 declares that while multiple parties may be negligent in a "fictitious payee" situation, the loss for the forgery should be placed on the employer "as a risk of his business enterprise," since he is "normally in a better position" to prevent that loss. § 3–405 comment 4. Section 3–405 does not invite courts to conduct a balancing test to determine the relative culpability of the parties involved; rather, this provision dictates that whenever a drawer's employee supplies "the name of the payee intending the latter to have no such interest," the indorsement is effective. Nowhere does § 3–405 state that the indorsement becomes *ineffective* by virtue of a bank's negligence. *See, e.g., Witten Prods.*, 401 S.E.2d at 391 (stating that "[m]ost courts have ruled that a bank's negligence is immaterial to the application of U.C.C. § 3–405(1)(c)").[16] Therefore, however negligent the depositary or drawee bank, the indorsement becomes, and remains, effective.[17]

Nor are the depositary banks completely satisfied with the result reached here. They argue that the official commentary following § 3–405, *see supra* note 10, evidences the drafters' intent to place complete liability upon the drawer whenever a § 3–405 situation arises. Thus, they contend, even the depositary banks' failure to comply with restrictive indorsements should not shift the loss from the employer, where § 3–405 has properly allocated it. The depositary banks' argument, though understandable, places more weight on § 3–405 than its language can bear. That language states that where, as here, a "fictitious payee" situation arises,

---

**15.** The full text of former § 3–419(3) reads:
Subject to the provisions of this act concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.
Va.Code § 8.3–419(3), *amended by* Va.Code § 8.3A–420 (Supp.1994).

**16.** *But cf. E.F. Hutton & Co. v. City Nat'l Bank*, 149 Cal.App.3d 60, 196 Cal.Rptr. 614, 620 (1983)

(holding that § 3–405(1)(c) does not bar separate tort action for negligence).

**17.** Qatar understandably relies on *Leigh Co. v. Bank of N.Y.*, 617 F.Supp. 147 (D.C.N.Y.1985) (applying New York law) for the proposition that a commercial reasonableness standard applies to § 3–405(1)(c). This decision is unpersuasive, for, as noted, such a standard contradicts the plain mandate of § 3–405 that the indorsement in a "fictitious payee" context is effective, irrespective of fault. Furthermore, the New York Court of Appeals implicitly rejected this view in a subsequent opinion. *See Prudential–Bache Sec., Inc. v. Citibank*, 73 N.Y.2d 263, 539 N.Y.S.2d 699, 704, 536 N.E.2d 1118, 1123 (1989).

the indorsement is effective. That is, even though the payee's signature is forged, it is treated for purposes of negotiability as if it were legitimate. *See Winkie, Inc. v. Heritage Bank of Whitefish Bay,* 92 Wis.2d 784, 285 N.W.2d 899, 904 (Ct.App.1979), *aff'd,* 99 Wis.2d 616, 299 N.W.2d 829 (1981). In this way, as comment four to this Code section explains, the banks will not be liable for cashing a check with a forged signature, and the loss will ordinarily fall upon the employer. *See Prudential–Bache,* 539 N.Y.S.2d at 702–03, 536 N.E.2d at 1121–22. This is as far as § 3–405 goes. Nothing in that provision rids a depositary bank of its independent obligation under § 3–206(2) to comply with restrictions attached to indorsements. *See Underpinning,* 414 N.Y.S.2d at 301, 386 N.E.2d at 1322; *Lehigh Presbytery,* 600 A.2d at 595; *Rutherford,* 622 P.2d at 249. While the signature is treated as an authentic one permitting payment on the check, payment must still be made in accordance with any accompanying restriction. The depositary banks are in wrongful possession of the drawer's funds not because they failed to discover the forgery, a burden from which they are relieved under § 3–405, but rather because they failed to comply with restrictions attached to the indorsement. As a result, the drawer may pursue a conversion action against the depositary banks with respect to those checks that were honored in violation of restrictive indorsements.[18]

## IV.

In sum, with respect to the first category of checks, namely those checks that were not indorsed at all, no conversion action may lie against the depositary banks since the latter never came into possession of the drawer's funds. In regard to the second category of checks bearing forged indorsements with no restriction, the drawer cannot sue the depositary banks in conversion since former § 3–405 renders the indorsements effective. Because the depositary banks have an independent duty to comply with restrictive indorsements under former § 3–206, however, the drawer may maintain an action against the depositary banks on those checks in the third category that were honored in violation of restrictive indorsements. With respect to the fourth category of checks, namely those checks bearing restrictive indorsements followed by Salous' personal account number, there is a factual question regarding whether the account number was added before or after the checks were first presented for deposit.

An appropriate order has already issued.

---

18. The 1993 amendments to the Code, were they applicable here, would affect the disposition of this case in several significant ways. For example, Virginia Code § 8.3A–420 (amending § 8.3–419) now explicitly provides that a drawer has no action in conversion against a depositary bank. *See* § 8.3A–420, comment 1 (stating that the Code now follows the rule announced in *Stone & Webster,* 184 N.E.2d 358). In addition, and more significantly, Virginia Code § 8.3A–405 (amending § 8.3–405) now imposes a duty to exercise ordinary care on banks in "fictitious payee" cases. Specifically, § 8.3A–405(b) provides that in the "fictitious payee" context, "[i]f the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss." Thus, "[i]f the bank failed to exercise ordinary care, subsection (b) allows the employer to shift loss to the bank to the extent the bank's failure to exercise ordinary care contributed to the loss." § 8.3A–405, comment 1. Under this amended "fictitious payee" provision, unlike the predecessor provision applied here, summary judgment would be inappropriate with respect to the second category of checks, since a factual issue exists regarding whether the depositary banks failed to exercise ordinary care, and if so, whether that failure contributed to the loss.