**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THE FEDERAL INSURANCE COMPANY,
                    *Plaintiff-Appellee,*

v.

SUSAN M. SMITH,
                    *Defendant-Appellant,*

and

MICHAEL C. SMITH; ESTATE OF
MYRON SMITH, by Susan M. Smith,
beneficiary,

                    *Defendants.*

No. 01-1857

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CA-00-397-A)

Argued: September 24, 2002

Decided: February 25, 2003

Before LUTTIG and TRAXLER, Circuit Judges, and
Norman K. MOON, United States District Judge for the
Western District of Virginia, sitting by designation.

Affirmed by unpublished opinion. Judge Moon wrote the opinion, in
which Judge Luttig joined. Judge Traxler wrote an opinion concurring
in part and dissenting in part.

**COUNSEL**

**ARGUED:** Douglas Elwood Bywater, TATE & BYWATER, LTD., Vienna, Virginia, for Appellant. Edward Graham Gallagher, WICK-WIRE GAVIN, P.C., Vienna, Virginia, for Appellee. **ON BRIEF:** Julia A. Bitner, WICKWIRE GAVIN, P.C., Vienna, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

MOON, District Judge:

Appellant Susan M. Smith was the wife of Myron Smith, who worked for the Armed Forces Benefit Association ("AFBA") as a life insurance claims analyst. Myron Smith stole a total of $300,000 from AFBA in an insurance fraud scheme, whereby he obtained checks payable to his brother for the death of persons falsely claimed to have named his brother as beneficiary. Susan Smith is not alleged to have had knowledge of her husband's fraudulent scheme, but a significant portion of the $300,000 was used to pay off her debts and obligations. Myron Smith was later killed in California, leaving Susan the beneficiary of a large life insurance policy.

Appellee Federal Insurance Company ("FIC") provided insurance coverage for the AFBA, including coverage for losses resulting from employee theft. FIC paid AFBA for its losses, and AFBA assigned all claims and rights of recovery relating to Myron Smith's thefts to FIC.

FIC brought this conversion action against Susan Smith seeking recovery of the $300,000. The trial judge, in a non-jury trial, found that Susan Smith was liable to FIC for conversion of $229,449.24 of the $300,000 Myron Smith fraudulently obtained from the AFBA. Susan Smith seeks reversal of the trial court's decision, asserting that

the law of conversion is inapplicable to the case for three reasons: (1) FIC did not have a right to the money at the time it was converted and thus has no standing to maintain the action; (2) she acted in good faith, had no knowledge of the fraud, and never exercised dominion or control over the funds; and (3) FIC's claim against her was merely an "undocumented intangible property right." We disagree and hold that, under the facts and circumstances of this case, Susan Smith is deemed to have converted all of the funds that Myron Smith fraudulently obtained and applied to her debts, whether she directly handled them or not.

Because this matter is in federal court on diversity grounds, the choice of law rules of the forum state, Virginia, apply. *Klaxon v. Stentor*, 313 U.S. 487, 496-97 (1941). The applicable Virginia choice of law rule, *lex loci delicti,* requires the application of Virginia substantive law to this case. *See Milton v. IIT Res. Inst.*, 138 F.3d 519, 521 (4th Cir. 1998). Where circumstances of this case are without directly applicable precedent in Virginia courts, we instead draw from principles of conversion law in Virginia and elsewhere to predict how this case would be decided in Virginia courts. In doing so, we review the district court's determinations of Virginia law *de novo*. *Salve Regina College v. Russell*, 499 U.S. 225, 231-32 (1991). The essential facts of the case are not in dispute on appeal.

I.

A.   *FIC's Standing to Pursue Conversion Claim*

We first address, and dispense with, Susan Smith's claim that FIC has no standing to bring a conversion action because it did not have a right to the funds at the time of conversion. AFBA, Myron Smith's employer and the immediate victim of his fraudulent actions, had a right to the funds at the time of conversion. FIC paid AFBA for the loss and AFBA explicitly assigned all of its rights and claims relating to Myron Smith's thefts to FIC. Therefore, FIC is subrogated to the rights and claims of AFBA, and FIC has standing to pursue a claim of conversion against Susan Smith.

B.   *Dominion and Control over Funds*

Next, we address Susan Smith's claim that she cannot be held liable because she was acting in good faith without knowledge of the

theft and never exercised dominion and control over the funds. There is no directly applicable law in Virginia regarding a conversion action against an innocent person for whose benefit embezzled funds have been spent. This requires that we consider general principles of conversion law in Virginia and elsewhere.

Virginia law defines conversion as any distinct act of dominion or control wrongfully exerted over the property of another, either inconsistent with, or in denial of, the owner's rights. *Hairston Motor Co. v. Newsome*, 253 Va. 129, 135, 480 S.E.2d 741, 744 (1997). A plaintiff seeking recovery on a claim of conversion must prove that the defendant converted it by "any" wrongful exercise of dominion or control that deprived the plaintiff of his rightful possession. *See, e.g., Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 75-76, 92 S.E.2d 359, 365 (1956), citing 19 *Michie's Jurisprudence*, Trover and Conversion, § 4 at 27. The Virginia Supreme Court, in *Universal C.I.T.*, provided the following description of conversion:

> Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion and it is not necessary that the wrongdoer apply the property to his own use. And when such conversion is proved, the plaintiff is entitled to recover, irrespective of good or bad faith, care or negligence, knowledge or ignorance.

*Id*. at 76.

As a rule, a wronged party can recover money converted if the possessor did not receive it in good faith or for valuable consideration, even if the money has changed forms. *See, e.g., Bader v. Central Fid. Bank*, 245 Va. 286, 427 S.E.2d 184 (where the plaintiff's bank paid on a forged instrument, the plaintiff could bring suit against the bank for conversion of the instruments). *See also In re Whitacre Sunbelt, Inc.*, 211 B.R. 411, 417-18 (Bankr. N.D. Ga. 1997), Restatement (Second) of Torts § 229 cmt. d (1965). In order to recover in conversion for money that has changed forms, however, the proceeds must be traceable to the original conversion. *Central Nat'l Bank v. Connecticut Mut. Life Ins. Co.*, 104 U.S. 54, 66-68 (1881) ("[money's] character is not changed by being placed to [a holder's] credit in his

bank account." *Id*. at 66). When proceeds can be traced to an embezzlement or conversion, courts in a majority of states considering the issue have allowed the wronged party to recover in two distinct scenarios, among others. Many states allow the wronged party to recover life insurance proceeds from the beneficiary when the policy premiums were paid with embezzled funds, usually by imposing a resulting or constructive trust on the life insurance proceeds. 24 A.L.R. 2d 672 (1952). Similarly, in a majority of states that have ruled on the issue, a chattel purchased with stolen money can be recovered if the possessor did not give consideration for it. 38 A.L.R. 3d 1354 § 8 (1971). Nothing in Virginia law indicates that Virginia courts would not follow the majority on these issues; we believe Virginia courts would likely adopt the same approach in this case. In these scenarios, there were specific funds upon which a trust could be imposed, i.e., the proceeds of the life insurance policy bought with stolen funds and the chattels bought with the stolen funds. Thus we believe Virginia would allow an action against an individual for funds transferred to that individual. Here, debts were paid with stolen funds and the question is whether Virginia would allow a conversion action in the absence of direct physical dominion and control over the proceeds. We hold that it would.

Susan Smith argues that she could not have converted the funds because she did not have sufficient dominion and control over them, and essentially that she was an innocent party to the conversion. While Susan Smith is assumed to have been acting in good faith, she gave no valuable consideration for any of the money that she directly controlled or that was paid to her accounts. The trial judge meticulously traced the embezzled funds to Susan Smith's accounts, whether the ultimate account was a bank account, or the payment of her debts. In so doing, he considered four categories of checking transactions and found the requisite dominion and control by Susan Smith over each.

First, the trial judge considered what he called the clearest example of conversion. In this transaction, Myron Smith gave Susan Smith a $4,500 check, written on a USAA Savings Bank checking account ("USAA account") he held jointly with his brother. Susan Smith subsequently deposited the check into a North West Federal Credit Union account ("NWFCU account"), held jointly by Susan and Myron

Smith. In another transaction, the trial judge considered a $56,000 check given to Susan Smith by Myron Smith. This check was drawn on the USAA bank account with instructions for Susan Smith to deposit the funds into their joint NWFCU account, and to use those funds to pay off the couple's NWFCU loans. Susan Smith deposited the $56,000 check and directed that the funds be used to pay loans on which they were jointly obligated. Thus, the stolen funds or their equivalent were in her physical possession before her debts were paid with them. We therefore hold that the facts and circumstances are sufficient to support the trial judge's determination that Susan Smith exercised dominion and control over the $4,500 check, and hold that she is liable to FIC for that portion of the converted money. We likewise hold the facts and circumstances sufficient to support the trial judge's finding that Susan Smith is liable to FIC for the conversion of the $56,000 check, money Susan Smith deposited to pay her joint obligations with Myron Smith.

A more difficult analysis is required when considering the funds over which Susan Smith exercised no physical dominion or control. One category of these funds involved Myron Smith issuing checks, totaling $57,261.52, drawn on his USAA checking account, to satisfy individual obligations of Susan Smith and joint obligations of the couple. In effect, Myron Smith converted the funds, then transferred them to his bank account, and then used the funds to pay Susan Smith's non-bank creditors to which she and Myron were jointly and severally liable.

If Susan Smith had actually handled the checks before they were used to satisfy her financial obligations, the transaction would be indistinguishable from the $56,000 check described above. We refuse to draw a distinction, however, based on the presence or lack of actual physical control over the funds. Susan Smith knew that when she incurred a debt, it would be paid by her husband from funds available to him, including funds derived from her salary as a Central Intelligence Agency employee. It was by their prior arrangement that Myron handled the couple's finances and would pay bills as they were presented. Myron Smith, in sending the payment, was doing only what Susan Smith expected of him and knew he would be doing on her behalf. Thus, there was virtually no distinction between her delivering the checks to her creditors and her husband mailing the

checks to her creditors. Furthermore, physical handling of converted property is not essential for liability for conversion, i.e. *Michie's Jurisprudence*, Trover and Conversion, § 4 at 27, citing *Wholesale Coal Co. v. Price Hill Colliery Co.*, 98 W.Va. 438, 128 S.E.2d (1925).

In this case, Susan Smith gave no consideration for the funds that were used to enrich her financial position by paying off her debts, and FIC's rights to the funds continued through the time the funds were used to pay those debts, at which point Susan Smith's creditors gave valuable consideration for the funds, effectively by canceling her debt. *Looney v. Belcher*, 169 Va. 160, 166-68, 192 S.E. 891 (Va. 1937) (forbearance of debt constitutes valuable consideration as one party is abandoning a legal right). When the debt was paid, the value of her estate, over which she had control, was increased in the amount of the payment. Thus, the funds were traced into her estate, and the fact that the funds were in the form of credit at this stage and no longer cash is of no matter. *See Bader v. Central Fid. Bank*, 245 Va. 286, 427 S.E.2d 184 (Va. 1993). We therefore hold that the facts and circumstances are sufficient to support the trial judge's determination that Susan Smith exercised dominion and control over the $57,261.52, and that she is liable to FIC for the conversion.

Myron Smith also issued, in a separate category of transactions identified by the trial judge, a check for $137,000 on the USAA account that was deposited into Susan Smith's and his joint NWFCU account and subsequently used to pay off various loans, bills, and other obligations of Susan Smith. We will apply the same analysis for this transaction as for the above $57,261.52 category. FIC presented evidence showing that $111,687.72 of these funds were used to pay Susan and Myron Smiths' joint obligations and expenses. We likewise hold that the facts and circumstances are sufficient to support the trial judge's determination that Susan Smith is liable for conversion of $111,687.72 of these funds.

In total, Susan Smith is liable to FIC for $229,449.24 of the funds stolen by Myron Smith from the AFBA.

### C. *Property Subject to Conversion*

Finally, Susan Smith urges this court to hold that the embezzled funds, used for her benefit, were an "undocumented intangible prop-

erty right," and therefore not subject to the law of conversion, relying upon *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 440 S.E.2d 902 (1994). In *Thrift*, a corporate officer of defendant Thrift Insurance forged documents that secured his personal loan. The forged documents purportedly were a guaranty of his parents to secure their son's loan by pledging a number of shares of stock they held in Thrift Insurance. When the officer defaulted, plaintiff United Leasing demanded that Thrift turn the shares of stock over to it. The Court held that United Leasing never had a right to the shares, but had only an "undocumented intangible property right" that did not give rise to a common law cause of action for conversion. *Id.* at 304-06.

Susan Smith's argument fails because unlike the plaintiff in *Thrift*, FIC had a right to the funds at the moment of embezzlement. Myron Smith fraudulently obtained checks from AFBA. He never had a right to the checks or the funds they represented, and AFBA remained the rightful owner of those funds. Thus, FIC's claim is not to an undocumented intangible property right, but to a clearly established property right.

## II.

The trial court also considered an alternative unjust enrichment theory under which FIC could recover from Susan Smith, determining that FIC was entitled to a smaller portion of embezzled funds, $96,687.72,* on this theory. We will not consider the alternative theory of unjust enrichment because the case is resolved in FIC's favor on the conversion claims.

## III.

In conclusion, the judgment of the trial court is affirmed.

*AFFIRMED*

---

*The unjust enrichment claim was based on a starting amount of $150,000, representing the funds Myron Smith obtained through one of the two fraudulent schemes. The remaining $150,000 would have been challenged on statute of limitations grounds. The trial court then calculated the portion of $150,000 that directly and unjustly enriched Susan Smith in order to arrive at the $96,687.72 figure.

TRAXLER, Circuit Judge, concurring and dissenting:

Because I do not believe that under Virginia law Susan Smith would be held liable on a theory of conversion for the money fraudulently obtained by her husband, I cannot agree that FIC is entitled to claim the full fraud loss amount from her. However, I agree with the district court on the alternative ground of unjust enrichment for a portion of the claim. For these reasons, I concur in part I.A. of the majority opinion, but respectfully dissent as to the remainder.

## I.

Susan's husband, Myron Smith, collected life insurance benefits from false claims he submitted under two bogus policies he obtained from AFBA. Both policies identified Myron's brother, Michael C. Smith, as the primary beneficiary. AFBA approved both claims and paid out benefits of $300,000 in four separate checks. Two checks, totaling $150,000, were issued in 1997 and two checks totaling the same amount were issued in 1998. All four checks were made payable to Michael and deposited into a joint USAA account in the names of Michael and Myron. There is no evidence that Susan had any knowledge of the scheme or of her husband's receipt of this money.

During a routine investigation in the fall of 1998, the Central Intelligence Agency ("CIA"), which employed Susan, discovered unusually large deposits in Myron and Susan's joint North West Federal Credit Union ("NWFCU") account. The CIA informed AFBA of the possible theft of life insurance proceeds around July 22, 1999. AFBA, in turn, contacted appellee FIC to initiate a claim under FIC's fidelity policy issued to AFBA. FIC accepted the claim and paid AFBA $290,000 on December 21, 1999.

In March 2000, FIC filed an action in the district court against Susan and Michael for conversion and against Myron's estate (Myron having died a few months earlier) for conversion and fraud. The court dismissed the claims against Michael and Myron's estate without prejudice for lack of service of process. The court then granted partial summary judgment on FIC's motion that it had standing to assert the remaining conversion claim against Susan, and thereafter conducted a bench trial. At the conclusion of the evidence, FIC moved without

objection to amend its complaint to add a claim against Susan for unjust enrichment as to insurance proceeds from 1998.[1]

The court gave FIC a judgment of $229,449.24 against Susan on its conversion claim, representing the portion of the $300,000 that was used to pay Susan's personal obligations as well as obligations for which Susan and Myron were jointly responsible. The court calculated this figure based on disbursements it broke into four categories. Category 1 reflected checks drawn by Myron on the USAA account totaling $57,261.52, which Myron used to satisfy Susan's individual and joint obligations. Category 2 reflected one $56,000 check drawn on the USAA account by Myron and given to Susan, who deposited the check into their joint NWFCU account and directed NWFCU to pay off various joint NWFCU loans. Category 3 reflected one $137,000 check drawn by Myron on the USAA account that was deposited in the NWFCU account and used to pay off assorted bills, loans, and other obligations of Susan and Myron. Category 4 was a single $4,500 USAA account check made payable to Susan, which she deposited into the NWFCU account. *See Federal Ins. Co. v. Smith*, 144 F.Supp. 2d 507, 512-16 (E.D. Va. 2001). The district court also found that FIC was entitled to judgment on a portion of this amount ($96,687.72) on the alternative ground of unjust enrichment. The lower figure on the unjust enrichment claim resulted from the expiration of the statute of limitations on a portion of the loss amount.

## II.

By the time FIC brought this action to recover the stolen money, the two-year statute of limitations had apparently run on a considerable portion of FIC's unjust enrichment claim, sharply limiting the amount of recovery available under that theory. Thus, in order to recover the total sum paid out to Myron, FIC pursued a claim for conversion, which carries a five-year statute of limitations. In my judgment, the need to proceed under conversion has compelled FIC to try to fit a square peg into a round hole.

---

[1]It appears that plaintiff limited this motion to the 1998 proceeds because any claim to prior proceeds was barred by the statute of limitations.

As my colleagues explain, there is no direct controlling precedent in Virginia allowing a conversion action against an innocent third party for whose benefit embezzled funds have been spent. Thus, we look to general principles of conversion law in Virginia and elsewhere. As the district court and my colleagues point out, the tort of conversion encompasses "[a]ny distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith . . . irrespective of good or bad faith, care or negligence, knowledge or ignorance." *Universal C.I.T. Credit Corp. v. Kaplan*, 92 S.E.2d 359, 365 (Va. 1956); *see also Hairston Motor Co. v. Newsome*, 480 S.E.2d 741, 744 (Va. 1997). In my view, however, Susan's exercise of dominion or control is irrelevant. The property at issue cannot be recovered under a theory of conversion because the four AFBA checks were cashed, the cancelled checks were returned to AFBA, and the cash received in return lost its identity when it was commingled with other funds.

Conversion descends from the common law action of trover. It "originated . . . as a remedy against the finder of lost goods who refused to return them to the owner but instead 'converted' them to his own use." Restatement (Second) of Torts § 222A cmt. a (1965). Whether property could be the subject of an action for conversion was assessed on the basis of the fiction of losing and finding, *i.e.*, any tangible chattel that could be lost and found could be converted. *See* W. Page Keeton, et al., *Prosser & Keeton on the Law of Torts*, § 15, pp. 90-92 (5th ed. 1984). Initially, it was held that money could not be converted unless it was contained within a bag or chest. *See Holiday v. Hicks* (1598) 2 Cro. Eliz. 638, 661. However, subsequent cases in England held that specific money could be the basis of an action for conversion if there was an obligation to pay or deliver money as it had been initially identified or segregated. This treatment has persisted and many jurisdictions still require that money be identified or segregated in the manner that a specific chattel can be. *See*, *e.g.*, *Allied Inv. Corp. v. Jasen*, 731 A.2d 957, 966 (Md. 1999); *SSI Med. Servs., Inc. v. Cox*, 392 S.E.2d 789, 792 (S.C. 1990); *Johnson v. Life Ins. Co. of Alabama*, 581 So.2d 438, 442-43 (Ala. 1991); *Taylor v. Powertel, Inc.*, 551 S.E.2d 765, 769-70 (Ga. Ct. App. 2001); *DeChristofaro v. Machala*, 685 A.2d 258, 263 (R.I. 1996).

The limitation on the tort of conversion to tangible property has been gradually relaxed so that some courts have also come to permit

actions involving documents in which intangible property rights have been merged, such as with a check, a promissory note, or a stock certificate. *See* Prosser & Keeton, *supra*, at 91. Because the document symbolizes or embodies the right to property, the conversion of the document has been held to include conversion of the intangible rights that the document represents, and to carry damages for it. *See id.* However, the evolution of the tort has largely stopped with the kind of intangible rights merged in or identified with a document. In keeping with the scope of this evolution, Virginia has allowed conversion claims premised on documented intangible property rights. *See United Leasing Corp. v. Thrift Ins. Corp.*, 440 S.E.2d 902, 906 (Va. 1994); *Unlimited Screw Prods., Inc. v. Malm*, 781 F.Supp. 1121, 1131 (E.D. Va. 1991) (interpreting Virginia law). However, where the rights at issue amount to undocumented intangible property rights — those that are not merged with a document and so cannot be physically possessed — Virginia's Supreme Court has held that they cannot be validly claimed in an action for conversion. *See Thrift*, 440 S.E.2d at 906 (holding that plaintiff's undocumented intangible property rights, represented by a fraudulent stock certificate, are not subject to a cause of action for conversion).

In this case, the property that Myron fraudulently obtained was represented by the four checks, each of which he deposited into the joint USAA checking account he shared with his brother. Once he deposited the AFBA checks into the USAA account and they were paid, the fraudulently obtained orders to pay money were fulfilled and cancelled. Thus, the original documents (the four checks) ceased to embody any intangible property rights and the funds formerly represented by the checks became part of a fungible pool of debits and credits in the bank. The funds formerly represented by the checks were not segregated and, in my opinion, were no longer susceptible to an action for conversion.

This is not to say that cash or negotiable instruments cannot be recovered on a theory of conversion. *See*, *e.g.*, *United States v. Moffitt, Zwerling & Kembler, P.C.*, 83 F.3d 660, 670 (4th Cir. 1996). So long as money is kept separate and identifiable, it can be converted. *Jasen*, 731 A.2d at 966; *Lewis v. Fowler*, 479 So.2d 725, 726 (Ala. 1985) (money must be segregated to be susceptible to an action for

conversion).[2] Nor is this to say that FIC could not have pursued Myron Smith for converting the four original checks. The critical distinction is that Susan Smith was never involved in the act of converting the checks and did not benefit from Myron's actions until after the documents supporting FIC's intangible property right had been fulfilled and cancelled. Despite the lower court's assiduous efforts to trace what was owed to FIC, once the AFBA checks were cashed, there ceased to be any meaningful way to treat the funds they once

---

[2]*Bader v. Central Fidelity Bank*, 427 S.E.2d 184 (Va. 1993), should not be read broadly for the proposition that "a wronged party can recover money converted . . . even if the money has changed forms." Majority Opinion, *supra*, p. 4. Rather, *Bader* specifically deals with a bank's obligation to an account holder upon payment on a forged instrument and should not be extrapolated to cases such as this involving innocent third parties.

The nature of how funds are held in a bank account illustrates why they do not lend themselves to a conversion action. The Virginia Supreme Court has described the limitations on the means of identifying funds as a specific chattel in the comparable context of susceptibility to set off between funds made the subject of a special deposit with notice to a bank and those deposited into an unrestricted general account:

> The general rule is that the relation between a general depositor and the bank in which his deposit is made is simply that of debtor and creditor. The moneys deposited immediately become the property of the bank, and the latter becomes debtor of the depositor . . . . Thus, the bank has a right of set off of any debt due it by the depositor against such deposit. However when funds are deposited for a special purpose with notice to the bank, the deposit does not become the property of the bank and the right of set-off does not exist.

*Bernardini v. Cent. Nat'l Bank of Richmond*, 290 S.E.2d 863, 864 (Va. 1982) (internal quotations and citations omitted). "By depositing the checks in a general account and commingling them with other nonexempt money, the . . . funds lost whatever exemptions they may have had." *Id.* at 865. This characterization also holds true in the context of conversion. *See Universal Mktg. and Entm't, Inc. v. Bank One of Arizona, N.A.*, 53 P.3d 191, 194 (Ariz. 2002) (citing *Bernardini* for the proposition that funds in a bank account, unless segregated, should not be recoverable under a theory of conversion).

represented as having been segregated according to the common law requirements necessary to sustain an action for conversion.[3]

This much of the fiction of losing and finding associated with the tort must remain intact, else the concept of conversion itself loses its distinct character. If this were simply a matter of holding on to a "hoary limitation," there might be no cause for concern. Prosser & Keeton, *supra*, § 15 at 91. However, the dangers of conversion losing such a distinguishing quality are readily apparent. Susan's debts were settled by payments made directly out of the USAA account on her behalf or by payment of checks into and out of her jointly-held NWFCU account by Myron. Under the theory advanced by the district court and affirmed here, if money is paid out of an account that contains some portion of funds "traceable" to a prior act of conversion, then any innocent third party receiving the benefit of that "traceable" money might be liable for conversion and compelled to pay it back. Such a principle sets no practical limit on the extent to which a court may pursue and authorize the repossession of funds.

There is a solution in this case, however, that makes a revision of the concept of conversion unnecessary. It is outlined in the alternative holding of the district court and in the language used by my colleague to describe Susan's culpability:

> In this case, Susan Smith gave no consideration for the funds that were used to enrich her financial position by paying off her debts, and FIC's rights to the funds continued through the time the funds were used to pay those debts, at which point Susan Smith's creditors gave valuable consideration for the funds. . . . When the debt was paid, the value of her estate . . . was increased in the amount of the payment.

---

[3]Even if a Virginia court were to permit this case to proceed on a theory of conversion, I do not believe there is any way Susan could be held to have exerted dominion or control over the $57,261.52 in checks (the Category 1 funds) that Myron himself wrote directly out of the USAA account.

Majority Opinion, *supra* at 7. I agree with this assessment, but believe it points to a different conclusion. The theory described is one of assumpsit, or unjust enrichment, not of conversion, and the law of unjust enrichment is well-settled in Virginia. *See*, *e.g.*, *Furr v. Arnold*, 119 S.E.2d 242, 246 (Va. 1961) ("It is a general rule that where one man has in his hands money which, according to the rules of equity and good conscience, belongs to and ought to be paid to another, an action will lie for such money as money received by defendant to plaintiff's use."); *Robertson v. Robertson*, 119 S.E. 140, 141 (Va. 1923) ("Assumpsit will lie whenever the defendant has received money which is the property of the plaintiff, and which the defendant is obliged by natural justice and equity to refund." (citation omitted)); *Shores v. Shaffer*, 146 S.E.2d 190, 194-95 (Va. 1966) (same). It is under the theory of unjust enrichment that I believe this case should be categorized. Had such a claim been advanced in a timely manner and the plaintiff not run afoul of the statute of limitations, I am sure it would have been on this theory alone that the district court would have been able to find Susan liable for a much greater amount. That the plaintiff cannot recover the entire fraud loss amount on an unjust enrichment theory now does not warrant our bending the tort of conversion to the breaking point.

### III.

I would award FIC only the amount recoverable on the alternative ground of unjust enrichment, not the additional amount represented by the ground of conversion. Thus, I concur in part I.A. of the majority opinion, but respectfully dissent as to the remainder.