**FEDERAL INSURANCE COMPANY,**
Plaintiff,

v.

**Susan M. SMITH, et al., Defendants.**

Civil Action No. 00–397–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

May 30, 2001.

Julia Ann Bitner, Wickwire Gavin, P.C., Vienna, VA, for Plaintiff.

Douglas Elwood Bywater, Tate & Bywater, Ltd, Vienna, VA, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this diversity action, plaintiff Federal Insurance Company ("FIC") initially sued defendant Susan Smith and others, *inter alia*, for common-law conversion of insurance proceeds stolen by defendant's now-deceased husband and used, in part, to satisfy defendant's personal and joint obligations and expenses.[1] Following pretrial

---

1. FIC's six-count complaint stated the following Virginia common-law claims: (i) conversion against defendant Michael Smith (Count I); (ii) conversion by defendant Myron Smith against Michael Smith (Count II); (iii) conversion against Susan Smith (Count III); (iv) conversion by Myron Smith and Susan Smith against Susan Smith (Count IV); (v) fraud

proceedings, only FIC's conversion claims against Susan Smith remained for trial.[2] The parties waived a jury and stipulated to many of the pertinent facts, so that only defendant's testimony was presented at trial. At the conclusion of the trial, FIC, by counsel, successfully moved orally to amend the complaint to conform to the evidence by adding a claim for unjust enrichment. The following sets forth the Court's findings of fact pursuant to Rule 52, Fed.R.Civ.P., and its conclusions of law.

## I. FINDINGS OF FACT [3]

Defendant Susan Smith married Myron Smith in January 1986 and lived with him in Alexandria, Virginia until October 1999. During this period, defendant worked for the Central Intelligence Agency ("CIA") as a systems administrator, and Myron Smith worked for the Armed Forces Benefit Association ("AFBA") as a life insurance claims analyst. The AFBA is a non-profit, voluntary member beneficiary organization that provides life insurance to members of the armed forces and their families. Plaintiff FIC provided insurance coverage for the AFBA, including coverage for losses resulting from employee theft.

The evidence discloses that Myron Smith, whose AFBA duties included processing life insurance benefits claims, was the central actor in an insurance fraud scheme. In essence, Myron Smith collected insurance benefits from false claims he submitted under two bogus policies he fraudulently obtained from the AFBA. More specifically, in late 1996, Myron Smith obtained the name and Social Security number of Jacqueline G. Hester, a soldier who died in New Jersey on June 6, 1996. Using Hester's name and Social Security number, Myron Smith drafted and submitted to the AFBA a falsified application for group life insurance coverage in the amount of $150,000 on Hester's life. The application identified Myron Smith's brother, Michael C. Smith, as the primary beneficiary of the policy.[4] Thereafter, Myron Smith made a false claim for a death benefit by submitting to the AFBA a Report of Casualty form falsely showing that Hester died on January 15, 1997 in Grafenwoehr, Germany, and that Michael Smith was the deceased's father.

The AFBA approved this claim and paid the Hester policy death benefit by two checks: (i) an Emergency Death Benefits check for $5,000 dated January 21, 1997, payable to Michael Smith and deposited into USAA Checking Account Number 033–8833–6, a joint account in the names of Michael and Myron Smith (the "USAA account"), and (ii) a check dated February

against the Estate of Myron Smith (Count V); and (vi) conversion against the Estate of Myron Smith (Count VI).

**2.** Originally-named defendants Michael C. Smith and Estate of Myron Smith were dismissed owing to FIC's failure to serve process on these defendants. *See Federal Ins. Co. v. Smith,* No. 00–397–A (E.D.Va. Feb.2, 2001) (order). Thus, only Counts III and IV—FIC's conversion claims against Susan Smith—remained for trial.

The parties' cross-motions for summary judgment were denied, except that FIC's motion for summary judgment on the issue of standing was granted. *See Federal Ins. Co. v.*

*Smith,* No. 00–397–A (E.D.Va. Apr.24, 2001) (order).

**3.** The following findings of fact are derived from (i) the parties' stipulation of facts, (ii) a draft statement of the Court's findings that the parties reviewed and essentially adopted, (iii) exhibits admitted into evidence, and (iv) the trial testimony of defendant.

**4.** The parties stipulated that Michael Smith is a resident of Alaska who, with the exception of an unspecified summer visit, has not been present in this district during the last five years.

19, 1997, for the remaining $145,000, made payable to Michael Smith and deposited into the same USAA bank account.

In 1998, Myron Smith repeated his fraudulent scheme. On this occasion, he created and processed a second fraudulent AFBA insurance policy, this time using the Social Security number of Jimmy J. Jeffries, a soldier in the United States Army who died while on active duty in California. Myron Smith submitted to the AFBA a falsified application for group life insurance coverage in the name of "Jimmy M. Smith" in the amount of $150,000. The application named Michael Smith as the policy beneficiary. Then, as in the case of the Hester fraud, Myron Smith made a false claim for a death benefit by sending the AFBA a false Report of Casualty form reporting Jeffries's death. And, once again, the AFBA paid a $150,000 death benefit by two checks, one for $5,000, dated April 21, 1998, and one for $145,000, dated April 28, 1998. Both checks were made payable to Michael Smith and both were deposited into the same USAA account of Myron and Michael Smith.

The motive for Myron Smith's fraudulent conduct is not difficult to discern. In 1996, defendant and Myron Smith were deeply in debt, and the evidence indisputably shows that the bulk of the $300,000 stolen by Myron Smith was used to pay these debts, which included defendant's personal obligations and obligations for which defendant and Myron Smith were jointly responsible. More specifically, the record convincingly reflects that $229,449.24 of the $300,000 stolen from the AFBA by Myron Smith was used (i) to pay defendant's personal debts or debts for which defendant and Myron Smith were jointly liable or (ii) to pay for defendant's personal expenses.[5] The details of these disbursements are central to the disposition of FIC's claims against defendant.

Disbursements of the $229,449.24 in issue fall into four categories:

Category 1: Myron Smith issued checks totaling $57,261.52 drawn on the USAA account to satisfy defendant's individual and joint obligations.[6]

Category 2: Myron Smith gave defendant a $56,000 check drawn on the USAA account with instructions to deposit the funds into defendant and Myron Smith's joint North West Federal Credit Union account (the "NWFCU account")[7] and to use the funds to pay off their various NWFCU loans. The evidence discloses that defendant agreed with her husband's instructions and followed them, first by depositing the $56,000 check into the NWFCU account at the NWFCU branch located at CIA headquarters and then by directing that the funds be used for the payment of various NWFCU loans on which de-

<hr/>

5. FIC claims that defendant converted $254,761.52 of the $300,000 stolen by Myron Smith, but makes no claim as to the $45,238.48 difference. The record reflects, however, that only $229,449.24 is directly traceable as having been paid to satisfy defendant's debts and expenses. The record otherwise does not clearly reflect what happened to the rest of the stolen money—that is, the $70,550.76 difference between $300,000, the total proceeds of the fraud, and $229,449.24, the amount disbursed to cover defendant's sole and joint obligations or expenses.

6. *See infra* Category 1 Table.

7. This NWFCU account is a "Member Account," under which Myron and Susan Smith obtained loans and opened several subsidiary accounts for banking, including a "draft account," an account similar to a checking account; a "share account," an account similar to a savings account; and a "premium savings account" ("PSA"), which was essentially a high-interest savings account.

fendant and Myron Smith were jointly obligated.[8]

Category 3: Myron Smith also issued a check for $137,000 on the USAA account that was deposited into the Smiths' joint NWFCU account and subsequently used to pay off various loans, bills, and other obligations of defendant.[9]

Category 4: Finally, Myron Smith gave defendant a $4,500 check written on the USAA account, which defendant subsequently deposited into the NWFCU account.[10]

Central to the disposition of FIC's claims against defendant are the details of the disbursements, which are set forth in the following tables:

| | | Category 1 | | |
|---|---|---|---|---|
| DATE | CHECK # | AMOUNT | PAYEE | PAYMENT PURPOSE |
| March 1, 1997 | USAA 102 | $ 626.83 | Macy's | payment of amount due on Myron and Susan Smith's joint credit card account |
| March 1, 1997 | USAA 103 | $ 9,637.26 | USAA FSB | payment of amount outstanding on Myron and Susan Smith's joint credit line |
| March 1, 1997 | USAA 104 | $ 4,922.84 | Crestar Bank | payment of Myron and Susan Smith's joint debt |
| March 1, 1997 | USAA 106 | $ 2,202.41 | American Centurion Bank | payment of amount due on Susan Smith's Optima credit card account |
| March 1, 1997 | USAA 107 | $ 3,515.10 | Morecard | payment of amount due on Myron and Susan Smith's joint account |
| March 1, 1997 | USAA 108 | $ 4,918.39 | American Express | payment of amount due on Susan Smith's credit card account [11] |
| March 1, 1997 | USAA 109 | $ 429.72 | USAA | payment of premium for Myron and Susan Smith's auto and homeowners' insurance for jointly owned automobiles and home |
| March 1, 1997 | USAA 111 | $ 1,999.53 | NWFCU | payment of amount due on Susan Smith's personal Visa account |
| March 1, 1997 | USAA 112 | $ 2,008.62 | Nordstrom | payment of amount due on Myron and Susan Smith's joint credit card account |
| March 1 or 2, 1997 | USAA 113 | $ 6,012.44 | AFBAIB | payment of amount due on Myron and Susan Smith's joint account |
| March 2, 1997 | USAA 119 | $ 1,628.00 | Washington Capitals | payment for the purchase of hockey seasons tickets for Myron and Susan Smith |

8. *See infra* Category 2 Table.

9. *See infra* Category 3 Table. The record does not disclose whether this check was deposited in the NWFCU account by defendant or Myron Smith. In general, it appears that defendant handled the majority of deposits to the NWFCU account and handled all transactions at the NWFCU CIA branch. It also appears that Myron Smith handled some NWFCU transactions, using a NWFCU branch located in Reston, Virginia. The record is silent on whether the $137,000 USAA check was deposited in the NWFCU account by Myron Smith at the NWFCU Reston branch or by defendant at the CIA branch.

10. *See infra* Category 4 Table.

11. Although defendant was individually responsible for this credit card account, Myron Smith was also issued a card that he used to charge purchases to the account.

| March 3, 1997 | USAA 118 | $ 330.00 | CWIHC | payment for Susan Smith's membership fees for Chesapeake Bay Women's Ice Hockey Club [12] |
|---|---|---|---|---|
| March 3, 1997 | USAA 120 | $ 4,579.04 | HFC | payment of amount due on Susan Smith's personal credit line |
| March 6, 1997 | USAA 121 | $ 1,000.00 | Washington Capitals | payment for purchase of hockey season tickets for Myron and Susan Smith |
| March 26, 1997 | USAA 127 | $ 670.00 | Homeside Lending | payment on Myron and Susan Smith's mortgage |
| March 26, 1997 | USAA 128 | $ 780.00 | American Express | payment of amount due on Susan Smith's credit card account |
| May 7, 1998 | USAA 133 | $ 10,000.00 | Portner's Landing Venture, LLC | partial down payment on a residential unit for Myron and Susan Smith [13] |
| June 6, 1998 | USAA 135 | $ 487.34 | Land Rover Alexandria | payment for purchase of items related to vehicle jointly owned by Myron and Susan Smith |
| June 16, 1998 | USAA 136 | $ 1,514.00 | Land Rover Alexandria | payment for purchase of accessories for vehicle jointly owned by Myron and Susan Smith |
| CATEGORY 1 TOTAL | | $ 57,261.52 | | |

| Category 2 | | | | |
|---|---|---|---|---|
| DATE | CHECK # | AMOUNT | PAYEE | PAYMENT PURPOSE |
| March 3, 1997 | USAA 114 [14] | $ 7,297.37 | NWFCU (Loan 1) | payment of joint loan obtained for purposes of debt consolidation and to pay for defendant's dental surgery |
| March 3, 1997 | | $ 14,613.70 | NWFCU (Loan 6) | payment of joint loan obtained to purchase a jointly titled automobile that defendant has since sold. |
| March 3, 1997 | | $ 32,280.20 | NWFCU (Loan 4) | payment of joint loan. |
| March 4, 1997 | | $ 1,808.73 | NWFCU (Loan 2) | payment of joint loan obtained to purchase a jointly titled vehicle that defen- |

12. There is no dispute that Susan Smith took possession of this check and paid her fees in person.

13. The total down payment was approximately $25,000, and Myron Smith paid the $15,000 balance from the NWFCU draft account on or about May 29, 1998—the same day Myron Smith transferred $15,000 from the PSA account to the draft account. The Smiths eventually did not purchase the unit, and one-half of the deposit was refunded to Myron and Susan Smith jointly.

14. Susan Smith hand-carried USAA check number 114, in the amount of $56,000, to the CIA NWFCU branch, deposited the check, and directed the following transactions: (i) she paid $7,297.37 to pay off a NWFCU loan to defendant and Myron Smith, jointly, identified as Loan 1; (ii) she paid $14,613.70 to pay off a NWFCU loan to defendant and Myron Smith, jointly, identified as Loan 6; (iii) she paid $32,280.20 to pay off a NWFCU loan to defendant and Myron Smith, jointly, identified as Loan 4; and (iv) she deposited $1,808.73 into the Smiths' joint checking account. On March 4, 1997, moreover, she paid $1,808.73 from the Smiths' joint checking account to yet another joint NWFCU loan, identified as Loan 2. *See also supra* note 8 and accompanying text.

dant has since given to Myron Smith's nephew.

| CATEGORY 2 TOTAL | $ 56,000.00 | | | |
| --- | --- | --- | --- | --- |

| Category 3 | | | | |
| --- | --- | --- | --- | --- |
| DATE | CHECK # | AMOUNT | PAYEE | PAYMENT PURPOSE |
| May 4, 1998 | USAA 134 [15] | $ 8,118.43 | NWFCU (Loan 3) | payment of loan in defendant's name that was obtained to purchase a car for defendant's mother |
| May 4, 1998 | | $ 23,360.49 | NWECU (Loan 5) | payment of loan in defendant's name that was obtained for vacation and home improvement purposes |
| May 4, 1998 | | $ 26,160.38 | NWFCU (Loan 7) | payment of joint loan obtained to purchase a jointly titled vehicle that defendant has since sold to one of Myron Smith's brothers on an installment sales contract. |
| May 4, 1998 | | $ 79,360.70 [16] | NWFCU | deposit into joint account |

**15.** Myron Smith wrote USAA check number 134, for $137,000, to the Smiths' joint NWFCU account. On May 4, 1998, the following transactions occurred: (i) a payment of $8,118.43 was made on a NWFCU loan, identified as Loan 3, in the name of Susan Smith; (ii) a payment of $23,360.49 was made on a NWFCU loan, identified as Loan 5, in the name of Susan Smith; and (iii) a payment of $26,160.38 was made on a NWFCU loan to defendant and Myron Smith, jointly, identified as Loan 7. The remaining $79,360.70 was placed in the Smiths' joint NWFCU share account. *See infra* note 16 and accompanying text.

**16.** This amount is the remainder of the $137,000 check that Myron Smith issued from the USAA account after payments on Loans 3, 5, and 7 were made. Of this amount, $70,241.72 was later transferred to the Smiths' newly opened PSA account. *See supra* note 15 and accompanying text. Over the course of the next year, most of the funds in this PSA account were transferred to the Smiths' draft account as the Smiths issued drafts to pay their individual or joint obligations, as follows:

a. On June 1, 1998, $15,000 was transferred from the PSA account to the draft account, before NWFCU check number 2093, payable to Portner's Landing Venture, LLC for $15,000 cleared on June 5, 1998.

b. On or about June 4, 1998, $4,000 was transferred from the PSA account to the draft account, from which Myron Smith thereafter drafted NWFCU check number 2743, payable to American Express for $3,900, to pay defendant's personal credit card bill.

c. On December 29, 1998, $19,500 was transferred from the PSA account to the draft account, and Myron Smith thereafter drafted NWFCU check number 2183, payable to American Express for $16,033 on December 30, 1998, to pay defendant's personal credit card bill.

d. On February 1, 1999, $20,000 was transferred from the PSA account to the draft account, within days either before or after Myron Smith drafted, *inter alia,* (i) NWFCU check number 2205, payable to Restoration Hardware for $4,436.03, to pay for furniture for the Smiths' residence; (ii) NWFCU check number 2206, payable to The Big Screen Store for $7,772.95, to pay for home electronics for the Smiths' residence; and (iii) NWFCU check number 2209, payable to International Carpet & Rugs for $1,119.66, to pay for replacement carpeting for the Smiths' residence.

e. On March 2, 1999, $3,308.78 was transferred to the draft account, and Myron Smith thereafter drafted NWFCU check number 2227, payable to Patricia Hazard for $2,500, as a loan to defendant's mother.

f. On March 15, 1999, $2,000 was transferred to the draft account, two days before Myron Smith drafted NWFCU check number 2239, payable to American Express for $1,943.59, to pay defendant's personal credit card bill.

| CATEGORY 3 TOTAL | | $137,000.00 | | |
|---|---|---|---|---|
| | | Category 4 | | |
| DATE | CHECK # | AMOUNT | PAYEE | PAYMENT PURPOSE |
| March 27, 1997 | USAA 125 | $ 4,500.00 | Susan Smith [17] | |
| CATEGORY 4 TOTAL | | $ 4,500.00 | | |

In sum, $229,449.24 of the $254.761.52 in disbursements traceable to the $300,000 stolen by Myron Smith from the AFBA was used directly to satisfy defendant's personal obligations, obligations for which defendant and Myron Smith were jointly responsible, and defendant's expenses.[18] And, significantly, there is no evidence that defendant gave her husband any valuable consideration in exchange for the payment of her individual and joint obligations with the stolen AFBA funds.

FIC makes no claim that defendant participated in Myron Smith's fraudulent scheme, or that she was aware of the scheme at the time the funds were disbursed. In this regard, defendant testified that when she asked her husband about the source of the funds deposited into the Smiths' NWFCU account, Myron Smith told her that the funds came from a credit line that Myron and Michael Smith had with USAA. She did not find this implausible despite her knowledge that she and Myron Smith were deeply in debt at the time. Not until later in 1998 did defendant have reason to believe that Myron Smith had come by the funds illegitimately.

In the fall of 1998, the CIA, in the course of a routine investigation, discovered unusually large deposits into the Smiths' NWFCU account. CIA investigators revealed their findings to defendant. FIC claims that defendant told the investigators at the time that she understood the money to be an "award" or "hush money" paid to Myron Smith for giving false testimony in a deposition on behalf of the AFBA. Defendant disputes this account,

g. On March 29, 1999, $2,000 was transferred to the draft account, three days before Myron Smith drafted NWFCU check number 2241, payable to American Express for $1,343.19, to pay defendant's personal credit card bill.

Thus, at least $54,048.42 of the $79,360.70 that remained of the $137,000 check drawn from the USAA account went towards paying defendant's individual and joint obligations and expenses. As to the remaining $25,312.28, defendant admits to writing checks from the draft account to purchase pizza and to pay hockey dues, and she also admits to knowing that checks from the draft account were being written to pay joint obligations. Myron Smith, who wrote most of the checks paid out of the NWFCU joint account, also used these funds to finance mountain climbing expeditions to Mount Kilimanjaro in Africa, to South America, and to Himalayan Mount Cho Oyu in Nepal. FIC, however, has only presented as evidence of these transactions monthly bank statements that fail clearly to show precisely how the remaining $25,312.28 was used by either defendant or Myron Smith. In this regard, it cannot be determined to what extent this remaining amount inured to defendant's benefit.

17. There is no dispute that Susan Smith took possession of the check when issued and deposited it into a joint checking account. *See supra* note 10 and accompanying text.

18. It must be noted again, however, that FIC has failed to demonstrate that $25,312.28 of the $137,000 check that Myron Smith drafted from the USAA account inured to defendant's benefit. *See supra* note 16.

testifying that she told the investigators she believed the 1997 and 1998 funds came from a joint credit line account that Myron and Michael Smith had with the AFBA, and that it was not until after she was interviewed by the CIA investigators that she confronted her husband and he then told her that the $150,000 he obtained in 1998 came from the AFBA as an award for giving false testimony in a deposition.

On or about July 22, 1999, the CIA informed the AFBA of the possible theft of life insurance proceeds by one of its employees. The AFBA, in turn, contacted FIC to initiate a claim under the FIC fidelity policy issued to the AFBA. As a result of its own investigation, FIC accepted the claim and paid the AFBA $290,000.00 on December 22, 1999. Pursuant to the policy's subrogation provision,[19] the AFBA assigned all rights of recovery relating to Myron Smith's thefts to FIC. Specifically, the AFBA signed an Assignment and Partial Release that stated:

> Armed Forces Benefit Association ("AFBA"), in consideration of the payment of Two Hundred Ninety Thousand ($290,000), the receipt of which is hereby acknowledged, does hereby on this 30th day of December 1999, assign to Federal Insurance Company ("Federal") all claims, rights, and causes of action against Myron Wm. Smith, Susan M.

Smith, Michael C. Smith, Jocelyn Sloan, the Estate of Myron Wm. Smith and any persons or entities, known or unknown, to whom the said Myron Wm. Smith, directly or indirectly, made any gift, devise, transfer or conveyance together with the right and power to sue upon, settle, compromise or release any such assigned right.

On October 20, 1999, Myron Smith left defendant and the marital relationship and moved to California to continue a relationship with a former high-school girlfriend. Even after Myron Smith's departure, defendant spoke to her husband daily. On October 31, 1999, shortly after relocating to California, Myron Smith was shot and killed.[20] Defendant is named as Executrix of Myron Smith's will, but has not probated the will, nor does it appear that she intends to do so. Defendant has distributed property, however, as evidenced by her sale of a jointly titled vehicle to Myron Smith's brother.[21]

Defendant went on leave without pay from the CIA on December 31, 1998, and ultimately resigned on October 29, 1999.

## II. CONCLUSIONS OF LAW

### A. Conversion

Under Virginia law,[22] conversion is "any distinct act of dominion wrongfully

---

**19.** The FIC fidelity policy issued to the AFBA provided, in pertinent part:

> In the event of any payment under this policy, [FIC] shall be subrogated to the extent of such payment to all the insured's rights of recovery, and the insured shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable [FIC] effectively to bring suit in the name of the Insured.

**20.** The record does not disclose who shot Myron Smith or why, nor is this information material to the resolution of the issues at bar.

**21.** *See supra* Category 2 Table.

**22.** Because this is a diversity case, *Klaxon v. Stentor*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), requires the application of Virginia's choice-of-law rule—*lex loci delicti* in this instance—which, in turn, requires the application of Virginia substantive law to this case. *See Milton v. IIT Res. Inst.*, 138 F.3d 519, 521 (4th Cir.1998) ("Virginia applies the *lex loci delicti*, the law of the place of the wrong, to tort actions . . . ."); *McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662, 663 (1979) ("In resolving conflicts of laws, the settled rule in Virginia is that the substantive rights of the parties in a multistate tort action

exerted over the property of another, and in denial of his rights, or inconsistent therewith." [23] Thus, a plaintiff asserting a conversion claim must prove by a preponderance of the evidence (i) the ownership or right to possession of the property at the time of the conversion and (ii) the defendant's conversion by the wrongful exercise of dominion or control over the plaintiff's property, depriving plaintiff of possession. [24]

The property here in issue is the money Myron Smith fraudulently obtained from the AFBA. Those funds were the property of the AFBA, which alone, at the time of the fraud and conversion, had an immediate, possessory interest in them. FIC succeeded to this interest in the funds and was subrogated to all of the AFBA's rights concerning the funds when it paid the AFBA for its loss of the funds pursuant to the FIC fidelity bond issued to the AFBA. Given this, FIC has standing to sue for conversion of the funds, and the principal remaining question, therefore, is whether defendant wrongfully exercised dominion or control over the stolen insurance proceeds and thus converted the funds. [25] The analysis required to answer

---

are governed by the law of the place of the wrong.").

23. *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 92 S.E.2d 359, 365 (1956); *see also, e.g., Economopoulos v. Kolaitis*, 259 Va. 806, 528 S.E.2d 714, 719 (2000) ("Conversion is the wrongful assumption or exercise of the right of ownership over goods or chattels belonging to another in denial of or inconsistent with the owner's rights."); *Bader v. Central Fid. Bank*, 245 Va. 286, 427 S.E.2d 184, 186 (1993) ("[C]onversion is any wrongful exercise or assumption of authority, personally or by procurement, over another's goods, depriving him of their possession.") (quotation omitted); *McCormick v. AT&T Techs.*, 934 F.2d 531, 535 (4th Cir.1991); *State of Qatar v. First Am. Bank of Va.* 880 F.Supp. 463, 466 n. 4 (E.D.Va.1995).

24. *See, e.g., Universal C.I.T.*, 92 S.E.2d at 365; *Bader*, 427 S.E.2d at 186.

25. A preliminary issue is raised by defendant's argument that FIC's conversion claim against defendant must fail because FIC's intangible property rights to the funds stolen by Myron Smith—as documented by the four AFBA benefits checks—vanished when Myron Smith deposited the checks into the USAA account. Thus, argues defendant, the right asserted by FIC in this case is merely an *undocumented* intangible property right that does not support a conversion claim under Virginia law. In support, defendant cites *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 440 S.E.2d 902, 906 (1994), which held that an undocumented intangible property right is not subject to conversion. Defendant's argument is unpersuasive.

It is well-settled that money and negotiable instruments may be converted. *See United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 670 (4th Cir.1996) (holding that the government had made out a claim for the conversion of funds subject to forfeiture); *see also* Restatement (Second) of Torts § 242 cmt .a (1965) ("[W]hen by the appropriate rule of law, the right to the immediate possession of a chattel and the power to acquire such possession is represented by a document, such document is regarded as equivalent to the chattel itself."); 54 Am.Jur.2d, Money §§ 5, 13 (1971 & Supp.1999); 18 Am. Jur.2d, Conversion § 17 (1985 & Supp.1999). Moreover, where converted property has assumed altered forms, the owner may follow it as far as he can trace it and sue at law for the substituted property, or he may hold the wrongdoer liable for appropriate damages. *See* 18 Am.Jur.2d, Conversion, § 146; *Porter v. Roseman*, 165 Ind. 255, 74 N.E. 1105, 1106 (1905) ("To charge appellee, it is not essential that appellant shall trace his identical money into the possession of appellee. It is sufficient to show that it went into his bank account."); *Central Nat'l Bank v. Connecticut Mut. Life Ins. Co.*, 104 U.S. 54, 66, 26 L.Ed. 693 (1881) ("If the money deposited belonged to a third person, and was held by the depositor in a fiduciary capacity, its character is not changed by being placed to his credit in his bank account.").

Here, the rights asserted by FIC against defendant are its documented property rights

this question varies somewhat with each category of transactions.

The single transaction that comprises Category 4 requires the simplest analysis, as it presents the clearest case of defendant exercising dominion or control over a portion of the fraudulently obtained funds. This transaction was a $4,500 check that was made payable and given to defendant, who then deposited the check into the NWFCU account. Thus, defendant, in this instance, had actual physical possession of a check made payable to her and representing funds directly traceable to the funds fraudulently obtained from the AFBA. It is difficult to imagine a clearer case of the exercise of dominion or control that is both wrongful and inconsistent with the AFBA's possessory rights to the money. It follows that defendant is liable for conversion of this money. This is so because it is well-settled that one who receives property from a thief is also liable to the rightful owner of the property for conversion, at least where, as here, the receiving person is not a bona fide purchaser of the property for value with no notice.[26] As the drafters of the Restatement (Second) of Torts ("Restatement") note,

> One who receives the possession of a chattel as purchaser, lessee, pledgee, donee, or otherwise, pursuant to a transaction by which he intends to acquire for himself or for a third person such a proprietary interest in the chattel, ordinarily exercises dominion or control over the chattel which is a sufficiently serious interference with the right of another who is entitled to immediate possession to control the chattel to amount to a conversion.[27]

This rule holds whether or not the property allegedly converted is in the form of money or negotiable instruments, and where, as here, the transferee does not receive the money in good faith or for valuable consideration. *See id.* § 229 cmt. d; 54 Am.Jur.2d, Money § 7 (1971 & Supp.1999). Of course, where the transferee takes possession of stolen money or negotiable instruments in exchange for valuable consideration, in good faith, and without notice of the transferor's lack of

---

to the money stolen by Myron Smith. Nor is FIC's claim for conversion of the insurance proceeds defeated by the fact that the money at issue assumed altered forms when deposited into the USAA account, and subsequently paid out to the Smiths' various creditors or deposited into the NWFCU account. Rather, the general rule, which the Supreme Court of Virginia would likely follow, allows FIC to trace the stolen funds to confirm their ultimate use. *See, e.g., Porter,* 74 N.E. at 1106.

**26.** *See, e.g., Porter,* 74 N.E. at 1106 (holding that where one who receives property from one who had no authority to dispose of it, the appropriation of the property to that person's own use is conversion); *Peoples State Bank v. Caterpillar Tractor Co.,* 213 Ind. 235, 12 N.E.2d 123, 125 (1938) ("[W]here the money or property is found in the possession of one who has parted with nothing, and who has not changed his position to his injury because of the apparent ownership of the one in pos-

session of the money, it will be returned to the true owner.").

**27.** Restatement (Second) of Torts § 229 cmt.b (1965). Thus, the Restatement further provides that

> [o]ne who receives possession of a chattel from another with the intent to acquire for himself or for a third person a proprietary interest in the chattel which the other has not the power to transfer is subject to liability for conversion to a third person then entitled to the immediate possession of the chattel.

Restatement (Second) of Torts § 229; *see also id.* § 229 cmt. e ("[O]ne receiving chattel from a third person with intent to acquire a proprietary interest in it is liable without a demand for its return by the person entitled to possession .... The mere receipt of the possession of the goods under such circumstances is conversion.").

right to possession, the transferee is not liable for conversion, as she would have received good title to the money and could not therefore exercise dominion or control over it in a wrongful manner inconsistent with the rights of the property's original owner.[28] But the record here convincingly demonstrates that defendant wrongfully exercised dominion over $4,500 of FIC's money and thus converted this money because she received these stolen funds without giving any consideration. Accordingly, defendant is liable to FIC for $4,500 in Category 4 funds.

◼ A similar analysis applies to defendant's liability for converting the stolen funds in Category 2—namely, the $56,000 that defendant, pursuant to her husband's instructions, agreed to deposit into the NWFCU account and thereafter to apply to pay various NWFCU loans on which defendant and her husband were jointly obligated. Here, defendant physically handled the $56,000 check, received this amount by virtue of its deposit into the NWFCU account, and directed its application to pay off four joint loans. In this regard, defendant's exercise of dominion or control over the funds and her intent to acquire a proprietary interest in the funds are clear.[29] And, as there is again no evidence that defendant was a bona fide purchaser for value with respect to this

transaction, her exercise of dominion and control over these funds was wrongful and she is liable for the conversion of this amount.

◼ Additional analysis is required to determine defendant's liability for converting stolen funds in Categories 1 and 3— namely, funds over which defendant did not physically exercise dominion or control, but which were used for defendant's benefit as payment for her personal and joint obligations and expenses. In this regard, there is no controlling Virginia authority on the question whether the knowing receipt of such a benefit makes the beneficiary a converter. However, general principles guide the search for the answer.

◼ As one course has sensibly held, to support a conversion claim, "[i]t is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, *or that the alleged converter has applied the property to his own use." Oakdale Village Group v. Fong,* 43 Cal.App.4th 539, 544, 50 Cal. Rptr.2d 810 (1996) (emphasis added). In this regard, the circuit court for Fairfax County, Virginia has indicated that where converted funds are deposited into a joint account, a defendant who "wr[ites] checks

---

**28.** *See, e.g., Colonia Ins. Co. v. City Nat'l Bank,* 988 F.Supp. 1242, 1252 (W.D.Ark. 1997) ("[A] bona fide purchaser for value of fraudulently obtained property becomes a converter when she takes possession of the fraudulently obtained property because the elements of conversion are met and a mistake of law or fact is no defense. However, an exception is recognized in the case of money or certain negotiable instruments because title is legally transferred to the person who takes possession.") (citations omitted); *Oakdale Village Group v. Fong,* 43 Cal.App.4th 539, 546, 50 Cal.Rptr.2d 810 (1996) (noting that "it is a general rule that an innocent purchaser for value and without notice, actual

or constructive, that his vendor had secured the goods by a fraudulent purchase, is not liable for conversion"); *Transamerica Ins. Co. v. Long,* 318 F.Supp. 156, 160 (W.D.Pa.1970) ("It is a rule of law that title to currency passes with delivery to the person who receives it in good faith and for valuable consideration.").

**29.** It is important to note that defendant also took physical possession of USAA check number 118, payable to CWIHC, with which defendant paid her hockey club dues. In this regard, defendant's conversion liability for that check is founded on similar grounds.

on the account, *ma[kes] use of account funds for himself or others*, or even kn[ows] that the embezzled funds were being deposited into the account" would be liable for conversion of the funds. *Passarelli v. Bentley*, 38 Va. Cir. 189, 1995 WL 1056004, at * 2 (1995) (emphasis added). The dispositive question as to defendant's liability for conversion of Category 1 and 3 insurance proceeds is therefore not *who* directed the disbursement of the funds, but rather *to whom* or for *whose benefit* these funds were disbursed, and whether that person is a bona fide purchaser for value.[30] This is so because a person to whom or for whose knowing benefit converted funds are knowingly disbursed exercises dominion and control over the funds by appropriating the funds for her own benefit. And, insofar as that person did not in good faith exchange valuable consideration for the funds appropriated, she acquires no good title to the funds, and her exercise of dominion or control over them is inconsistent with the true owner's rights.[31] Put differently, a person who receives stolen funds or otherwise directly benefits from their use, and does not in good faith give valuable consideration in

exchange for the funds, wrongfully exercises or assumes authority over the property. *See McCormick v. AT&T Techs.*, 934 F.2d 531, 535 (4th Cir.1991); *Bader v. Central Fid. Bank*, 245 Va. 286, 427 S.E.2d 184, 186 (1993).

These principles, applied to the circumstances of this case, compel the conclusion that defendant is liable for converting Category 1 and 3 proceeds. As to the $57,261.52 in Category 1 that Myron Smith paid directly from the USAA account to satisfy defendant's individual and joint obligations, defendant wrongfully exercised dominion or control over these funds by directly benefitting from the use of these funds to satisfy her individual and joint obligations. In this regard, these funds were transformed upon payment into credits posted on defendant's accounts—or, put differently, defendant's release from individual or joint and several liability to various creditors. Such a receipt of a direct financial benefit from the application of the insurance proceeds clearly constitutes defendant's wrongful appropriation of these stolen funds. It is immaterial that defendant did not physically handle these

---

**30.** Defendant's argument that the proper inquiry cannot be into who benefitted from the disbursement because benefit is the focus of an action for unjust enrichment is unpersuasive. First, this Court has previously noted that "[t]he two torts are quite similar." *State of Qatar v. First Am. Bank of Va.*, 880 F.Supp. 463, 466 n.4 (E.D.Va.1995); *see also* Restatement (First) of Restitution § 128 (1937) ("A person who has tortiously obtained, retained, used, or disposed of the chattels of another, is under a duty of restitution to the other."). Second, the benefit conferred upon defendant in this case goes beyond indirect benefit not involving the exercise of dominion or control over the stolen funds; rather, the benefit conferred upon defendant is the exclusive appropriation of the stolen funds to satisfy her personal and joint obligations. In this regard, defendant's benefit necessarily involves the exercise of dominion or control over the

stolen funds, to the exclusion of the AFBA's right to the funds.

**31.** *See Oakdale Village*, 43 Cal.App.4th at 546, 50 Cal.Rptr.2d 810 (noting that one who receives converted funds would be liable for conversion "where the goods are taken from the fraudulent possessor with knowledge of the fraud, or with knowledge of such facts and circumstances as would have put cautious and prudent men on inquiry, even though full value has been paid for the property"); Restatement (Second) of Torts § 229 cmt.b. (1965) ("The purported sale, lease, pledge, gift, or bailment which is ineffectual as against the true owner of the chattel makes the purported purchaser, lessee, pledgee, donee, or bailee subject to liability to the owner for conversion.").

funds;[32] it suffices that these converted funds were used to satisfy defendant's sole or joint obligations, for they were thus effectively transferred to defendant's possession through the agency by which defendant chose to receive the funds.[33] By accepting the stolen insurance proceeds in the form of payments to her creditors on her behalf, and because she gave no consideration in return, defendant became no less a converter of the proceeds than if she had directly appropriated the funds for her own use. *See, e.g., Porter v. Roseman,* 165 Ind. 255, 74 N.E. 1105, 1106 (1905); *Peoples State Bank v. Caterpillar Tractor Co.,* 213 Ind. 235, 12 N.E.2d 123, 125 (1938). Indeed, a contrary conclusion would allow the recipient of stolen property to avoid liability for conversion by simply arranging to avoid taking physical possession of the property, while nonetheless directly benefitting from it. *See Oakdale Village Group,* 43 Cal.App.4th at 544, 50 Cal. Rptr.2d 810. It follows that defendant is liable to FIC for conversion of the $57,261.52 in stolen insurance proceeds that fall into Category 1.

 The same result obtains with respect to $111,687.72 of Category 3 funds. As the record clearly reflects, this portion of Category 3 funds was used to retire various loans on which defendant was obligated and otherwise directly to benefit defendant,[34] who provided no consideration in return. As to the remaining $25,312.28, however, FIC simply has failed to offer

clear evidence showing the extent to which this amount inured to defendant's benefit and not simply to Myron Smith's sole benefit. The mere fact that this amount at some point remained in the NWFCU account is insufficient to support defendant's liability for converting these proceeds. Accordingly, defendant's liability for Category 3 proceeds is limited to $111,687.72.

In sum, defendant is liable to FIC for $229,449.24 of the $300,000 stolen by Myron Smith from the AFBA.

### *B. Unjust Enrichment*

At the conclusion of the trial, FIC successfully moved to amend its complaint to conform to the evidence by adding a claim for unjust enrichment with regard to the Jeffries insurance proceeds.[35] FIC's motion was granted under Rule 15(b), Fed. R.Civ.P., as defendant neither registered an objection, nor showed that such an amendment would result in prejudice to her. *See Pinkley, Inc. v. City of Frederick,* 191 F.3d 394, 400–02 (4th Cir.1999) (" 'Because notice to the defendant of the allegations to be proven is essential to sustaining a cause of action, Rule 15(b) applies only when the defendant has consented to trial of the non-pled factual issues and will not be prejudiced by amendment of the pleadings to include them.' ") (quoting *Gilbane Bldg. Co. v. Federal Reserve Bank of Richmond,* 80 F.3d 895, 901 (4th Cir.1996)). It therefore remains to be

---

**32.** *See Oakdale Village,* 43 Cal.App.4th at 544, 50 Cal.Rptr.2d 810.

**33.** *Cf. Porter v. Roseman,* 165 Ind. 255, 74 N.E. 1105, 1105–06 (1905) (holding that although payment of converted funds was to various banks and not directly to defendant, the banks "constituted the agency selected by [the defendant] for the collection of his notes, and in every proper sense a payment to the bank was payment to [the defendant]").

**34.** *See supra* note 16 and accompanying table.

**35.** It appears that FIC limited its motion to the Jeffries insurance proceeds because inclusion of the Hester proceeds would likely have provoked a challenge on statute of limitations grounds. *See Belcher v. Kirkwood,* 238 Va. 430, 383 S.E.2d 729, 730–31 (1989) (holding that Virginia's three-year statute of limitations period applies to unjust enrichment claims); Va.Code § 8.01–246(4).

determined to what extent defendant is also liable for the Jeffries insurance proceeds under FIC's unjust enrichment claim.

Under Virginia law, an action for unjust enrichment "will lie whenever one has the money of another which he has no right to retain, but which *ex aequo et bono* he should pay over to that other." [36] Thus, to prove its claim for unjust enrichment, FIC must prove (i) that it had a preexisting right to the money and (ii) that the defendant justly should not retain the money. *See City of Norfolk v. Norfolk County,* 120 Va. 356, 91 S.E. 820, 825–26 (1917); *John C. Holland Enters., Inc. v. J.P. Mascaro & Sons,* 653 F.Supp. 1242, 1246 (E.D.Va.1987); *Liebau v. Seven Oaks Ltd. Partnership,* Chancery No. 118066, 1991 WL 834960, at *1 (Va. Cir. Ct. May 9, 1991).

It is clear that FIC had a preexisting right to the money stolen by Myron Smith by virtue of its assignment and subrogation of the AFBA's rights to them.[37] Thus, the principal question is whether defendant justly should not retain those portions of the Jeffries insurance proceeds traceable as having been used directly to satisfy her individual and joint obligations—namely, $123,689.06 of the $150,000 policy benefit disbursed through USAA check nos. 133, 134, 135 and 136.[38] In this regard, it is well-settled that a third party may be liable for restitution to a defrauded party for money had and received to the extent she is enriched.[39] Here, defendant is plainly liable to make restitution for the amount of her personal and joint obligations paid from the Jeffries policy proceeds, as the discharge of these debts inured to defendant's benefit directly despite the AFBA's (and now FIC's) entitlement to them. *See, e.g., Furr v. Arnold,* 202 Va. 684, 119 S.E.2d 242, 245–46 (1961); *National City Bank v. Stang,* 84 Ohio App.3d 764, 768, 618 N.E.2d 241 (1992). Simply put, where one uses money stolen from a defrauded party to reduce the debts of a third party, "the discharge of the debts is a benefit equal to the funds employed," and the third party "would be liable to make restitution ... for the amount of his personal debt extinguished on his behalf" by the defrauder. *National City Bank,* 84 Ohio App.3d at 768, 618 N.E.2d 241.

It would be inequitable, however, to require defendant to pay restitution for the

---

**36.** *State of Qatar v. First Am. Bank of Va.,* 880 F.Supp. 463, 466 n. 4 (E.D.Va.1995) (quoting 2A Michie's Jurisprudence of Virginia and West Virginia, *Assumpsit* § 17 (1993)); *see, e.g., Shores v. Shaffer,* 206 Va. 775, 146 S.E.2d 190, 194–95 (1966) ("Assumpsit will lie whenever the defendant has received money which is the property of the plaintiff, and which the defendant is obliged by natural justice and equity to refund."); *Furr v. Arnold,* 202 Va. 684, 119 S.E.2d 242, 246 (1961) ("It is a general rule that where one man has in his hands money which, according to the rules of equity and good conscience, belongs to and ought to be paid to another, an action will lie for such money as money received by defendant to plaintiff's use."); *Robertson v. Robertson,* 137 Va. 378, 119 S.E. 140 (1923) (same).

**37.** *See supra* text accompanying notes 24–25.

**38.** *See supra* Category 1 and 3 Tables.

**39.** *See John C. Holland,* 653 F.Supp. at 1246 ("[I]n Virginia, a plaintiff may bring an action for 'money had and received' to recover monies received by the defendant from a third party, but ... the plaintiff must demonstrate that the plaintiff had a preexisting *right* to that fund."); *City of Norfolk v. Norfolk County,* 120 Va. 356, 91 S.E. 820, 822 (1917); *National City Bank v. Stang,* 84 Ohio App.3d 764, 618 N.E.2d 241, 243 (1992); Restatement (First) of Restitution § 142 cmt.b. (1937) ("If a person who is without fault has received specific land or chattels, .... [and] they have been beneficially consumed, he is under a duty of restitution only to the extent that their consumption has saved him expenditure.").

$25,000 paid by the Smiths to Portner's Landing Venture as a deposit on a residential unit. Defendant testified that half of this amount was forfeited when Myron resigned from the AFBA and that the refunded half was spent by Myron to fund a mountain-climbing trip to Nepal. In this regard, this amount did not inure to defendant's benefit, and restitution would be inequitable in this circumstance. It would also be inequitable to require defendant to pay restitution for $2,001.34 paid by USAA checks 135 and 136 to purchase accessories and other items related to the Smiths' jointly owned Land Rover. Defendant testified that Myron Smith drove this vehicle, and the benefits of these two purchases would have inured solely to Myron Smith. It follows, therefore, that, of the $150,000 stolen by Myron Smith through the fraudulent Jeffries policy, defendant is liable to make restitution to FIC for $96,687.72 that directly inured to defendant's benefit.

Seeking to avoid this conclusion, defendant argues that FIC's recovery on its unjust enrichment claim is barred by the change in her circumstances since the insurance proceeds inured to her benefit. This argument fails. To be sure, a third party who benefits from another's fraud is liable "only if there has been no change of circumstances making it inequitable to require restitution." *National City Bank*, 618 N.E.2d at 243; *see also W.B. Hibbs &*

*Co. v. First Nat'l Bank of Alexandria*, 133 Va. 94, 112 S.E. 669, 673–74 (1922). As one court put it, "the primary rule is that if repayment will cause the recipient loss, restitution is barred to the extent that such loss would occur." *Hilliard v. Fox*, 735 F.Supp. 674, 677–78 (W.D.Va.1990); *see also* Restatement of Restitution § 142 cmt.b ("Any change of circumstances which would cause ... the recipient entire or partial loss if the claimant were to obtain full restitution, is such a change as prevents full restitution ...."). However, it is well-settled under Virginia law that "[t]o defeat a recovery [on grounds of changed circumstances] after the receipt of an unjust enrichment, the circumstances must be such as to make it inequitable to require restitution, and such a change of circumstances must not be caused by tortious dealing with the subject-matter by the party unjustly enriched." *Central Nat'l Bank of Richmond v. First & Merchants Nat'l Bank of Richmond*, 171 Va. 289, 198 S.E. 883, 892 (1938). Thus, change of circumstances is not a defense if "the change occurred after the recipient had knowledge of the facts entitling the other to restitution and had an opportunity to make restitution." [40] There is no loss, moreover, where the money had and received either was used for the payment of debts incurred prior to its receipt or for defraying personal living expenses.[41] This

---

**40.** Restatement of Restitution § 142; *see Hilliard*, 735 F.Supp. at 676 (noting that "[t]he Supreme Court of Appeals of Virginia has cited the Restatement of Restitution as authority"); *Cooper v. Greenberg*, 191 Va. 495, 61 S.E.2d 875, 879 (1950); *Maryland Cas. Co. v. Aetna Cas. & Sur. Co.*, 191 Va. 225, 60 S.E.2d 876, 879 (1950); *Central Nat'l Bank of Richmond*, 198 S.E. at 893.

**41.** As the Restatement provides:
[w]here money has been paid which the payee has used for the payment of debts incurred prior to its receipt, such payment of debts does not constitute a change of circumstances which would prevent restitution by him .... Nor is there such a change of circumstances where the money is used for the payment of living expenses ... or even used to make gifts, unless such expenses were incurred or gifts made because of the receipt of the money and the amount of such payment was of such size that considering the financial condition of the payee it would be inequitable to require repayment.

is so because, in these instances, "repayment will not normally cause the recipient any net loss—he will merely be returned to *status quo ante.*" *Hilliard,* 735 F.Supp. at 678.

■ These well-settled equitable principles, applied here, compel the conclusion that the defense of changed circumstances is inapplicable to $96,687.72 of the Jeffries insurance proceeds. First, of the $137,000 transferred by Myron Smith from Myron and Michael Smith's USAA joint account to the Smiths' joint NWFCU account through USAA check number 134, $57,639.30 was disbursed to pay off preexisting debts for which defendant was either personally or jointly liable.[42] In this regard, the changed circumstances doctrine is inapplicable to this amount.[43] Second, of the remaining $79,360.70 from USAA check number 134, $39,048.42 went to pay defendant's living expenses and credit card purchases.[44] Defendant made no showing at trial that "such expenses were incurred because of the receipt of the money" stolen by Myron Smith .[45] Indeed, defendant testified that she believed the "money" to have come from a credit line— that is, yet another debt—obtained by her

husband for their joint use. In this regard, it would be inequitable not to require defendant to pay restitution for these amounts, as defendant had no right to enjoy the benefit of this money, and restitution to FIC, the rightful owner, would only return defendant to the *status quo ante.* Moreover, $34,148.42 of this amount was disbursed *after* defendant had been confronted by CIA investigators in the Fall of 1998 and had been made aware of the likely illegal source of the funds by Myron Smith's statement that the funds were compensation for giving false testimony.[46]

In summary, FIC is entitled to a judgment in the amount of $229,449.24 against defendant on its conversion claims, as defendant wrongfully exercised dominion and control over this portion of the stolen funds. FIC is also entitled to a judgment on a portion of this amount—namely, $96,-687.72—on the alternative ground of unjust enrichment.

An appropriate Order shall issue.

---

Restatement (First) of Restitution § 142 cmt.b.

**42.** This amount was used to pay (i) $8,118.43 to pay off a loan obtained to purchase a car for defendant's mother; (ii) $23,360.49 to pay off Loan 5, a loan in defendant's name that was obtained for vacation and home improvement purposes; and (iii) $26,160.38 to pay off Loan 7, a joint loan obtained to purchase a jointly titled Land Rover. *See supra* notes 15–16 and accompanying text.

**43.** *See* Restatement (First) of Restitution § 142 cmt.b.

**44.** This amount was disbursed through (i) NWFCU check number 2743, payable to American Express for $3,900; (ii) NWFCU check number 2183, payable to American Express for $16,033; (iii) NWFCU check num-

ber 2202, payable to Restoration Hardware for $4,436.03; (iv) NWFCU check number 2206, payable to The Big Screen Store for $7,772.95; (v) NWFCU check number 2209, payable to International Carpet & Rugs for $1,119.66; (vi) NWFCU check number 2227, payable to Patricia Hazard for $2,500; (vii) NWFCU check number 2239, payable to American Express for $1,943.59; and (viii) NWFCU check number 2241, payable to American Express for $1343.19.

**45.** Restatement (First) of Restitution § 142 cmt.b.

**46.** Specifically, all of the disbursements, except NWFCU check number 2743, payable to American Express for $3,900, were made in or after December 29, 1998—months after defendant was first confronted by CIA investigators.